**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re SUPREME INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 3:17-cv-143-TLS-MGG |
| | CLASS ACTION |
| | JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**Table of Contents**

I.     SUMMARY OF THE ACTION .................................................................. 1

II.    JURISDICTION AND VENUE .............................................................. 6

III.   PARTIES ................................................................................................ 6

    A.  Lead Plaintiff ................................................................................... 6

    B.  Defendants ....................................................................................... 7

IV.   RELEVANT BACKGROUND AND FACTS ....................................... 8

    A.  Overview of the Company .............................................................. 8

        1.  Supreme Executives Implemented Strategic Initiatives to Drive Sales and Expedite the Manufacturing Process ......................................... 10

        2.  Supreme Relied Heavily on Fleet Customers to Drive Revenues ............................. 12

        3.  The Connection Between Supreme's Backlog and Future Revenues........................ 15

    B.  Defendants Provided Materially Misleading Information Concerning Supreme's Backlog During the Class Period ......................................................... 18

    C.  Confidential Witness Corroborates that Defendants Attempted to Disguise Falling Demand ....................................................................................... 19

V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ....................................... 21

        1.  2015 Third Quarter False and Misleading Statements................................. 21

        2.  2015 Fourth Quarter False and Misleading Statements................................ 23

        3.  2016 Second Quarter False and Misleading Statements............................... 24

        4.  Analysts Adopted the Materially False and Misleading Statements ........................ 25

VI.   THE TRUTH IS REVEALED: SUPREME DISCLOSES DISAPPOINTING BACKLOG FIGURES, SHARE PRICE PLUMMETS .................................. 25

    A.  Supreme Discloses Backlog Figures that Contradict Prior Representations .................. 25

B. Analysts Link Supreme's Disclosure of Disappointing Backlog Figures to
   Stock Price Decline ........................................................................................ 29

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 32

A. Senior Supreme Executives, Including Weber and Long, Were Heavily
   Involved in the Company's Sales Process ........................................................ 33

B. Suspicious Insider Selling by Senior Executives and Board Members Also
   Creates a Strong Inference of Scienter .............................................................. 34

VIII.   LOSS CAUSATION ...................................................................................... 36

IX.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
        ARE INAPPLICABLE ................................................................................... 40

X.      CLASS ACTION ALLEGATIONS ................................................................. 40

XI.     LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION
        OF RELIANCE .............................................................................................. 42

XII.    CAUSES OF ACTION ................................................................................... 44

COUNT I ................................................................................................................... 44

COUNT II .................................................................................................................. 46

XIII.   PRAYER FOR RELIEF ................................................................................. 47

XIV.    DEMAND FOR JURY TRIAL ...................................................................... 48

Lead Plaintiff Kenneth L. Fishman ("Fishman" or "Lead Plaintiff"), by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on, among other things, the independent investigation of Court-appointed Lead Counsel, Bragar Eagel & Squire P.C. and Kirby McInerney LLP.  This investigation included, among other things, a review and analysis of:  (i) public filings by Supreme Industries, Inc. ("Supreme" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) public reports and news articles concerning, among other things, the alleged wrongful conduct discussed herein; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with Supreme senior management; (vi) consultations with former employees of the Company; and (vii) other publicly available material and data.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to the Defendants and are exclusively within their custody or control.  Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a federal securities class action against Supreme and certain of its officers and directors for violations of the federal securities laws.  Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of himself and all similarly situated purchasers of Supreme securities between October 22, 2015 and October 21, 2016, inclusive (the "Class Period"). Lead Plaintiff alleges that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by misrepresenting the true nature and status of the

Company's order backlog, which was recognized by investors and analysts as the surest indicator of future financial success. Specifically, Defendants attributed an unusually large 2015 third quarter order backlog to "strong order activity" when in fact it was due to several atypical orders. When the truth was revealed, shareholders suffered significant losses. The Individual Defendants, knowing their false statements during the Class Period had artificially inflated the price of Supreme's stock, profited from massive insider sales.

2. Supreme is recognized as one of the trucking industry's most diversified manufacturers of truck body parts, offering a wide range of specialized commercial vehicles including truck bodies, trolleys, and specialty vehicles, though most of the Company's products are attached to light- and medium-duty truck chassis. During the Class Period, the Company controlled approximately 20% of the market and was the second largest player in the custom truck body part space.

3. Despite being publicly traded, Supreme remains a small operation managed by a small cadre of key executives including defendants Mark D. Weber ("Weber"), Supreme's Chief Executive Officer ("CEO"), and Matthew W. Long ("Long"), Supreme's Chief Financial Officer ("CFO"). As a small company, senior management was heavily involved in the day to day operations of the Company. Weber, in particular, took a hands-on approach to management; he played a key role in implementing strategic initiatives designed to drive sales and expedite the manufacturing process, participated in weekly sales calls that addressed sales goals and successes and failures, frequently visited regional offices, and made it a point to keep in close contact with the Company's largest customers.

4. As an industrial manufacturer, Supreme operates in a highly cyclical industry and experiences seasonal swings. This is because the Company's "fleet" customers, such as Budget

and Penske, although few in number, comprise a significant portion of the Company's annual revenue and provide the greatest dollar spend per customer.  Seasonal demand for Supreme's products peaks in the first half of the year because fleet orders are typically placed in the first and second quarters.  Throughout the Class Period, Defendants repeatedly reinforced that the Company's fleet customers ordered on regular cycles, in the first half of the year.

5.      As a manufacturing company that specializes in building truck body parts to order, Supreme acknowledged that its backlog, unfinished work or customer orders that have not yet been completed, was a critical indicator of the Company's current performance and the surest indicator of future revenues.  Internally, the Company, including Weber and Long, meticulously tracked order flow to determine when new orders were expected, the status of order completion, and when completed trucks would roll out of the manufacturing facilities.  Supreme disclosed its backlog figures to investors on a quarterly basis to provide insight into the Company's current and future business.  However, despite the significance of reported backlog, Supreme did not disclose granular level detail concerning the backlog's component parts, nor did it provide intra-quarter updates on the backlog.  During earnings calls, attempts to connect backlog to future revenue was a repeated source of analyst and investor inquiry.  Defendants conditioned investors to focus on backlog as the most critical reported metric, but did not provide enough real time information for them to completely understand how backlog would impact future performance.

6.      Throughout the Class Period, Defendants repeatedly stressed to investors that the Company's strong backlog numbers would translate into future sales and revenue.  Specifically, in the third quarter of 2015, Supreme reported a backlog that was larger than the Company's historical precedent.  Defendants characterized the source of the large backlog as ordinary business when, as later revealed, the large backlog was due to large fleet orders atypical of the third quarter.

Thus, unknown to investors and analysts, the large 2015 third quarter backlog was anomalous in both size and source. Nevertheless, Defendants expressed their expectation that backlog would continue to grow and failed to disclose the true source of the increased 2015 third quarter backlog. As late as July 22, 2016, Defendants still falsely represented that sales were on track and that the 2016 third quarter backlog would be similar to the prior year period. Specifically, when reporting the 2016 second quarter financial results, Long responded to a question about the outlook for the second half of 2016 by stating that "***the backlog is going to settle more towards the way it looked Q3 last year***."

7.      In reality, during the Class Period, the truck industry was experiencing a significant slowdown, and this decline appears to have begun negatively impacting Supreme's business no later than summer 2016, and progressively worsened as the 2016 third quarter continued. Yet Defendants continued to paint a rosy picture, while selling their personally owned stock, indicating that future results would match the anomalous 2015 third quarter results and investors had no reason to suspect anything was amiss.

8.      Company insiders, including Weber and Long, however, knew the truth – that the timing of several large fleet orders had influenced Supreme's backlog at the end of the 2015 third quarter and that sales were not meeting projections. Insiders recognized that the backlog information being reported to the market was misleading and that Supreme stock was inflated. These insiders took advantage of this knowledge by selling a significant portion of their Supreme shares at inflated prices. Collectively, insiders, including Weber and Long, netted almost ***$12 million*** during the Class Period. Tellingly, approximately $9.3 million, or more than 75%, of that amount resulted from transactions during the three-month period from July 22, 2016 through October 21, 2016, corresponding directly to the sales slowdown.

4

9.      As a result of Defendants' misrepresentations, the market was shocked when, on October 20, 2016, after the market closed, the Company reported an unexpected third quarter backlog decline of 22% year over year that directly contradicted the Company's prior representations that backlog was tracking the previous year.  In reporting the unexpected shortfall, Defendants finally disclosed that the large 2015 third quarter backlog figure was the result of several one-off events, specifically "two large fleet replacement orders and the timing of an annual fleet account order."  Even though Weber also acknowledged, for the first time, that "industry-wide growth in commercial truck sales decelerated during the summer months" of 2016, Weber maintained that Supreme's current reported backlog was in line with prior years.  Investors, however, seized on Defendants' admission that the 2015 third quarter backlog was anomalous. Defendants knew this information was false and misleading when it was originally disclosed to investors.

10.      Once the truth concerning the massive decline in Supreme's backlog and the source of the large 2015 third quarter backlog was revealed, investor confidence in Supreme was shattered and an immediate decline in the price of Supreme shares ensued.  On October 21, 2016, the first day of trading following these disclosures, Supreme shares fell $4.28 per share, or over 23.8%, from $17.96 to close at $13.68 per share on extremely high trading volume of more than 1.6 million shares (compared to average trading volume of approximately 150,000 shares per day).  On the next trading day, October 24, 2016, the share price of Supreme stock declined more than 17%, from $13.68 to $11.30, again on extremely high trading volume of more than 1.6 million shares.

11.      As set forth herein, Defendants consistently indicated strong growth during the Class Period and provided false and misleading descriptions of the surest indicator of growth, *i.e.*, the Company's backlog.  These misrepresentations were highly material to investors and analysts,

as evidenced by the significant decline in the price of Supreme's shares once the truth was revealed. Investors were severely injured by the fraud, and Lead Plaintiff seeks damages on behalf of the entire Class.

## II.   JURISDICTION AND VENUE

12.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud and the effects of the fraud occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located within this Judicial District.

15.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiff

16.   Lead Plaintiff purchased Supreme common stock during the Class Period, as detailed in the sworn certification filed previously, ECF No.1-1, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.      Defendants**

17.      Supreme is incorporated in Delaware and headquartered in Goshen, Indiana.  The Company went public in 1984, and shares of Supreme currently trade on the NYSE MKT under the ticker symbol "STS."

18.      Weber served as Supreme's CEO, President, and a director throughout the Class Period.

19.      Long served as Supreme's CFO throughout the Class Period.

20.      Weber and Long are sometimes referred to herein as the "Individual Defendants," and together with Supreme, "Defendants."  During and prior to the Class Period, the Individual Defendants, as senior executive officers of Supreme, were privy to confidential and proprietary information concerning Supreme, its operations, finances, and financial condition, including material adverse nonpublic information concerning Supreme's customer backlog.  Because of their possession of such material information, the Individual Defendants knew or recklessly disregarded that the adverse facts detailed herein had not been disclosed to, and were being concealed from, the investing public.

21.      The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Supreme's business.

22.      As officers and controlling persons of a publicly-held company whose shares are registered with the SEC and were traded on the NYSE MKT, the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Supreme, and to correct

7

any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants each violated these specific requirements and obligations during the Class Period.

## IV.   RELEVANT BACKGROUND AND FACTS

### A.   Overview of the Company

23.     Supreme is recognized as one of the most diversified manufacturers of truck body parts in the industry. The Company manufactures specialized commercial vehicles that are attached to a truck chassis. The truck chassis, which consists of an engine, drivetrain, a frame with wheels, and in some cases a cab, is manufactured by third parties who are major automotive or truck companies. Such companies typically do not build specialized commercial vehicles. Supreme fills this gap by building specialized vehicle bodies and by installing other equipment on truck chassis, most of which are provided through converter pool agreements or are owned by dealers or end-users. Examples of custom truck body part add-ons include liftgates, cargo-handling equipment, customized doors, special bumpers, ladder racks, and refrigeration equipment.

24.     Supreme is primarily a "build-to-order" operation with very limited production occurring in anticipation of new orders. To ensure greater control over its production cycle, Supreme maintains exclusive control over the sales and manufacturing processes. While Supreme describes itself as "vertically-integrated," it does not manufacture the truck chassis upon which its products are attached. Instead, Supreme purchases truck chassis from third-party manufacturers like GM or International (Navistar). In addition, Supreme avoids keeping truck chassis in inventory to prevent the cost and sales value of the chassis from flowing through Supreme's income statement. Instead, Supreme aims to minimize its financial obligations by obtaining light-duty truck chassis on a consignment basis from manufacturers. For medium-duty trucks, the

chassis are more expensive and the truck configurations designed by Supreme are more involved. As such, Supreme typically arranges for medium-duty truck chassis to be shipped to Supreme when a specific customer order is placed.  At all times the medium-duty truck chassis remains the property of Supreme's customer.  Using this procurement strategy, the Company places a premium on executing on customer orders as quickly as possible.

25.     To generate customer orders, the Company maintains a sales network of over 1,000 dealers and distributors nationwide.  In addition, the Company operates eight geographically-dispersed plant and distribution sites to ensure that the Company can satisfy customer demand quickly.  The following chart, from an April 2016 corporate presentation, provides a pictorial overview of how the Company strategically locates its manufacturing sites nationwide to satisfy customer demand expeditiously.



26.     During the Class Period, the Company reported controlling approximately 20% of the market and being the second largest player in the custom truck body part space.   By implementing the strategic initiatives described herein, Supreme consistently described to investors how it planned to transform itself into the market leader.

### 1.     Supreme Executives Implemented Strategic Initiatives to Drive Sales and Expedite the Manufacturing Process

27.     Despite being publicly traded, Supreme remains a comparatively small operation with only 1,400 employees.  Of those employees, only 70 were engaged in direct sales during the Class Period.

28.     Supreme's senior management is similarly composed of a small cadre of key executives.  In addition to Weber and Long, other key executives include Mike Oium ("Oium"), Vice President of Operations, and Mickey McKee ("McKee"), Vice President of Sales.  This senior management team was in place throughout the Class Period.

29.     Prior to and during the Class Period, Supreme launched a series of restructuring efforts designed to optimize financial performance through increased emphasis on improving sales, manufacturing, and operational processes.   Senior management was heavily involved in these restructuring initiatives and consistently touted the ethos of "kaizen," which is the Japanese word for the "strategy where employees at all levels of a company work together proactively to achieve regular, incremental improvements to the manufacturing process."[1]

30.     The ongoing restructuring efforts continued into the Class Period.  For example, during a July 22, 2016 earnings call, Weber described how the Company reorganized its sales force to increase efficiency and take advantage of its national footprint:

---

[1] *See* "What is Kaizen?", LeanProduction.com, *available at*: http://www.leanproduction.com/kaizen.html (last accessed April 24, 2017).

We're little different than some of our competitors in terms of how we structure in our sales team.  So, each of our plants, we have a district sales team that runs out of that plant.  ***So, we have five district sales team distributed around the country and they're out calling on end users.***

***So, I think the fact that we've invested a lot in terms of supplementing our sales group with some additional talent, some additional head count in markets that we were under serving and we've trained*** – in our sales organization that the team have to sell, how to really go out and sell our value proposition.

***We're using Salesforce so that we give them some tools to be more effective in terms of following up on leads and things like that.***  So, I think that we're getting leverage out of our sales team in these districts, where maybe you go back three years or four years, five years ago, they were little more passive than active versus today.

31.     Senior managers, including Weber, played a key role in implementing these process improvements and were engaged in the operations of the regional offices.  For example, Weber and other senior executives participated in weekly sales calls that addressed sales goals and relative successes and failures.  In addition, the introduction of the SalesForce CRM platform was designed, in part, to ensure that customer contacts were tracked and to provide executives insight into the sales process in real time.  Weber, however, did not manage from a distance.  He frequently visited regional offices and, as disclosed during earnings calls, he made it a point to keep in close contact with the Company's largest customers.   Weber acknowledged the effect of these strategic initiatives as well as his hands-on sales approach in a February 19, 2016 earnings call:

Well, we've invested as I said, we've invested a lot in our sales organization as well as operations.  So I think it's a combination of those two segments of our organization executing at a much higher level than they have in the past.  ***I've spent a lot of time myself in the field in front of customers talking to them about their current supply about our performance and what their expectations are***, that's all rolled into our value proposition.

32.     Prior to and during the Class Period, Supreme embarked upon a "lean manufacturing" initiative designed to increase the efficiency of the Company's manufacturing operations by reducing waste and product cycle times.  In addition, the Company sought to

reconfigure and consolidate its main Indiana manufacturing campus while also consolidating other operations to improve efficiencies.  For example, the Rhode Island service center was consolidated with a Pennsylvania manufacturing plant.  The Company also divested its trolley product line to dedicate resources to its truck body part growth strategy.  Weber and other senior executives spearheaded these initiatives.  During the February 19, 2016 conference call, Weber summarized these initiatives and their goals by stating:

> Supplementing our sales team to maximize regional and national account coverage, optimizing our fabrication strategy to improve speed and product cost, deployment of lean manufacturing techniques to eliminate waste and reduce cycle times, development of new products that can expand our solutions' portfolio, and initiating a process to populate a deal pipeline for accretive acquisitions.  *We believe this mix of initiatives will allow continued organic growth opportunities, bringing our cost structure more in line with class leading benchmarks and set the stage for some additional diversity in our product portfolio.*

33.     In the same February 19, 2016 conference call, Weber described how the Company's strategic initiatives drove the Company's growth:

> *Our order backlog increased to just over $100 million – just under a $100 million by the end of December.*  This is 32% higher than at the end of September of 2015 and up 23% from the end of 2014.  *The backlog growth is a direct result of improved close rates on our deal pipeline and more consistent execution from our operations' teams.  On a year-over-year basis, we posted solid double-digit increases in new orders during 2015, which is reflected in our stronger backlog.*

34.     As set forth herein, while Defendants consistently promised strong growth during the Class Period, in the face of weakening industry conditions, they provided false and misleading descriptions of the surest indicator of growth, *i.e.*, the Company's backlog.

### 2.     Supreme Relied Heavily on Fleet Customers to Drive Revenues

35.     Supreme serves a variety of customers including national rental fleets, national and regional leasing companies, truck chassis dealers, and fleet operators.  The Company divides its customers into three categories:  (1) retail; (2) fleet; and (3) other.  Historically, retail clients composed the most significant percentage of Supreme's annual sales.  Yet, these sales were spread

across hundreds of accounts that may or may not purchase from Supreme again.  By contrast, fleet customers, which Supreme defines to include national truck rental companies, including Budget and Penske, were fewer in number but provided far greater dollar spend per customer.  In addition, fleet customers typically placed orders at regular intervals, unlike retail customers.

36.     The following chart, from an April 2016 Company presentation, illustrates the breakdown of Supreme's revenue by customer category:



37.     During the Class Period, the Company repeatedly emphasized that Supreme sold its products to a broad universe of customers and that "smaller" customer orders comprised the bulk of its revenue.  For example, in an April 2016 Company presentation, Supreme reported that during 2015, about 47% of its accounts were under $3 million.  Supreme represented that this statistic demonstrated that its customer base was not concentrated, but this statistic was misleading. In reality, Supreme's customer base is far more concentrated than disclosed to investors.

38.     As demonstrated by the prior chart, "fleet" customers comprised a significant portion of the Company's annual revenue even though they were few in number.  The materiality

13

of fleet customers to Supreme's overall business was reflected in its regulatory disclosures.  For example, in its 2016 Form 10-K, filed with the SEC on March 3, 2017, Supreme highlighted the significance of fleet customers.  For 2016, one fleet customer accounted for approximately 31% of net sales.  For 2015, two fleet customers accounted for approximately 24% and 11% of net sales.  For 2014, one fleet customer accounted for approximately 16% of net sales.

39.     In addition to comprising a significant portion of Supreme's annual revenue, the timing of fleet customer orders materially affected the Company's operations.  As discussed in an April 2016 Company presentation, "[s]easonal demand peaks typically in first half of year driven by rental fleet orders."  The Company recognized that receiving a significant portion of its orders during the first half of the year had a material impact on its operations and disclosed this fact in its 2015 Form 10-K, filed with the SEC on February 2, 2016 ("2015 Form 10-K"):

> The Company's business can be cyclical due to the normal replacement cycle particularly of its truck products (historically approximately seven years) being subject to customers delaying purchases due to adverse changes in economic conditions and other long range factors that can affect the transportation industry. ***Seasonality arises due to the Company typically participating in bids for large fleet contracts.  If successful, the fleet orders generally require shipment of the truck bodies in the first and second quarters.***

Consequently, the Company created and reinforced the impression that fleet orders would be placed during the first half of each year, despite the anomalous 2015 third quarter.

40.     In addition, the Individual Defendants and other senior Supreme executives remained in close contact with large customers and discussed their purchasing plans.  For example, during the 2016 third quarter earnings conference call, on October 21, 2016, in response to a question regarding major customers' demand, Weber stated:

> Yeah, for next year, ***I was talking to a area VP with a major leasing company on the West Coast yesterday.  And we were talking about just general business.***  And he said in his area – now, again, that's a region not the entire United States.  But he said that in the medium duty, light duty side, they're pretty much flat right now year-over-year.

14

41.     Based on the foregoing, Supreme and its senior executives created the impression that the Company's fleet customers ordered on regular cycles and that any divergence from those patterns would have been disclosed to investors.

**3.     The Connection Between Supreme's Backlog and Future Revenues**

42.     Backlog generally refers to unfinished work or to customer orders that have been received but are either incomplete or in the process of completion.  As a manufacturing company that specializes in building truck body parts to order, Supreme acknowledged that its backlog was a critical indicator of the Company's current performance and the surest indicator of future revenues.  Internally, the Company meticulously tracked its order flow to determine when new orders were expected to come in, the status of order completion, and when completed trucks would roll out of the manufacturing facilities.

43.     Moreover, as discussed above, senior Supreme executives, including the Individual Defendants, focused on the Company's current and anticipated backlog, which was discussed, *inter alia*, during weekly sales calls.

44.     Supreme disclosed its backlog figures to investors on a quarterly basis to provide insight into the Company's current and future business.

45.     Defendants recognized that the Company's backlog provided insight into current and future performance.  Supreme reinforced this view to investors.  During earnings calls and in regulatory filings, Supreme drew direct connections between reported backlog and the Company's operations.  The Company's repeated focus on and discussion of its quarterly backlog gave this metric a higher level of materiality to investors.  Consequently, analysts and investors parsed Supreme's backlog and considered the figure to be a primary indicator of the Company's current and future performance.

46.     The following excerpt from an August 26, 2016, Singular Research ("Singular") report entitled "Supreme Industries – A Value Play With Accelerating Business Momentum" is representative of investors' focus on Supreme's backlog:

**Growing order backlog.**  Aided by continued demand for truck bodies coupled with strong sales team and a vast dealer/distribution network of more than 1,000 commercial dealers, Supreme has been witnessing continued growth in order backlog over the past few years.  Sales order backlog at 2Q16 end totaled $75.5 million, compared with $74.0 million at 2Q15 end.  The current backlog mainly consists of retail orders, aiding in conversion to sales during the next quarter.

47.     Despite the significance of reported backlog, the Company did not publicly report granular level detail concerning the backlog.  For example, in the 2016 first quarter Form 10-Q, filed with the SEC on April 29, 2016, Supreme reported:  "Sales order backlog at the end of the first quarter of 2016 totaled $102.0 million, compared with $94.3 million at the end of the first quarter of 2015 and $98.1 million at the end of 2015."

48.     As such, analysts and investors consistently pushed the Company to provide additional detail during earnings calls.  For example, during the October 23, 2015 earnings call, Weber drew upon his decades of experience in the trucking industry to contextualize the relationship between the Company's current backlog and future prospects:

Well, that's a little bit of, but our backlog is going to – as grow the business, I mean let's say, for example, if you're shipping $1 million a day and you've got 60 days in your backlog, you've got a $60 million backlog.  If you're only shipping $500 million a year, you've got half of that in your backlog in that same cycle time.  *So, as the company grows and our shipments per day grow, our backlog is going to have to get a little bit larger to sustain that level of business.*

\*       \*       \*

*I've lived in the truck business for over 30 years.  Obviously, you see the cycles*.  Where we're at in the cycle, I don't think the lead times are unusual or sort of out of the norm.  *It's not constraining us, our plants are busy and we're moving along and it's not problematic for us at this point*.

16

49.     Beyond tracking backlog, investors also pushed Supreme to describe how backlog translated into revenue.  Supreme provided answers.  For example, during the October 23, 2015 earnings call, Weber provided a timeframe for how backlog is realized, on a retail and fleet breakdown:

> I'll talk a little bit about the timeframe of that backlog flowing through.  Set aside the rental fleet business because, as you know, we typically are quoting that and securing those orders in the fourth quarter and they don't flow through typically until the second quarter.  So that has a little bit longer-than-normal cycle time on the rental business.
>
> ***None of that really is in our backlog right now.***  But, typically, if you're looking at sort of retail and normal leasing business, light-duty goes through a little quicker because we're working off the pool chassis there.  You're probably talking about 30 days to 60 days on the medium-duty, which is all customer supply chassis.  That's probably closer to 60 days to 120 days.

50.     Attempts to connect backlog to future revenue were a persistent source of inquiry during earnings calls.  For example, when pressed during the October 21, 2016 earnings call to describe how backlog would specifically translate to future revenues, Long responded, "***That would then ask me to forecast and we don't have 100% throughput.***  What we typically say in the quarters that we're not running fleet business, our backlog is roughly 90 days business.  So, it should be somewhere in that realm."

51.     In addition to not providing a specific backlog to revenue translation formula, the Company refused to provide intra-quarter updates on the backlog.  Accordingly, Defendants conditioned investors to focus on reported backlog as the most critical reported metric, but did not provide enough real time information for them to completely understand how backlog would impact future performance.

**B.**     **Defendants Provided Materially Misleading Information Concerning Supreme's Backlog During the Class Period**

52.     Beginning in mid-2015, the vast majority of the trucking industry was experiencing a significant slowdown.  As an October 12, 2016 article on Trucks.com titled "Trucking Industry Faces Weak Freight Demand into 2017" reported, "Truck manufacturers are laying off workers, carriers are cancelling orders for new vehicles, and shipping rates and volumes are slumping."  A significant contributing factor to the slowdown was an excess of used trucks in the market.  As Cliffside Research ("Cliffside") stated in an October 22, 2016 report titled "The Party Is Over For Supreme Industries, Inc.," there is a "glut in used trucks" and the "used truck market may remain oversupplied for up to four years."

53.     The decline in the trucking industry appeared to impact the Company's business as early as summer 2016, and progressively worsened as the third quarter continued.  As Cliffside explained, "As used truck values decline, there is less incentive to buy new trucks and this directly impacts [Supreme]."

54.     As alleged in more detail herein, on information and belief, former employees at Supreme's Cleburne, Texas facility described how 2016 sales quotas had to be reduced once it became clear that Supreme would not be able to hit the numbers, and that sales were "many tens of thousands of dollars" below Tim McDonald's ("McDonald"), Director of Sales for Texas region, initial forecast.  Moreover, a former employee noted that there were "signs in July of a sales shortfall," and as Weber later admitted in a post-market close October 20, 2016 press release, "industry-wide growth in commercial truck sales decelerated during the summer months" of 2016.

55.     Despite industry pressures and weakening sales, throughout the Class Period, Defendants repeatedly stressed to investors that the Company's strong backlog numbers would translate into future sales and revenue.  Specifically, in the 2015 third quarter, Supreme reported a

18

backlog that was significantly larger than historical precedent. Defendants characterized the source of the large backlog as ordinary business when, in fact, the large backlog was due to large fleet orders which, based on the cyclical nature of Supreme's business, were atypical of the third quarter. Thus, the large 2015 third quarter backlog was anomalous, especially given the state of the trucking industry.

56.    Rather than disclose the true source of the large 2015 third quarter backlog so that the market price of the Company's common stock would be based upon truthful and accurate information, Defendants continued to express their expectation that backlog would continue to grow. As late as July 22, 2016, Defendants were still stating that sales were on track and that "***the backlog is going to settle more towards the way it looked Q3 last year***." As a result of Defendants' misrepresentations and material omissions, the market was shocked when, on October 20, 2016 (after market close), the Company reported an unexpected third quarter backlog decline of 22% year over year, and admitted for the first time that the 2015 third quarter backlog was inflated because of one-time events, and the stock price fell almost 24% the next trading day.

57.    Unlike investors, Company insiders, including Weber and Long, were able to use their knowledge about the true state of affairs at Supreme for their own profit by selling a significant portion of their shares during the Class Period at inflated prices. As detailed herein, Company insiders netted approximately $12 million from insider sales during the Class Period. Even more shocking, the vast majority of these sales occurred between July 22, 2016 and October 21, 2016, shortly before Defendants revealed the truth.

## C.    Confidential Witness Corroborates that Defendants Attempted to Disguise Falling Demand

58.    A Confidential Witness ("CW") provides additional support for many of the foregoing allegations.

59.     CW was employed as a Production Scheduler at Supreme's Texas facility during the Class Period.  CW's duties included production scheduling, managing operations, procurement, and working with Supreme's Texas division General Manager to prepare "monthly budgets and goals."  A key element of CW's duties included determining how many completed units the Texas division needed to produce to meet "monetary" projections for a given period, so CW's work included tracking order backlog for the Texas division.

60.     CW recalled that, prior to CW's departure in August 2016, CW, along with others at the Cleburne office, had been concerned about the outlook for the 2016 third quarter results because McDonald was "not coming up with his numbers."  Although CW could not say exactly how far below his projections McDonald had been as of the time of CW's departure, CW stated that it was certainly by many tens of thousands of dollars, and that McDonald was in "too deep a hole to make up" the shortfall in the remainder of 2016.  CW noted that there were "signs in July of a sales shortfall" and that she believes there should have been more concern about it at that time.

61.     CW confirmed that the practice of "pulling in" orders that were expected to be placed and/or fulfilled in a future period to make numbers in an earlier period occurred at the Cleburne facility.  CW stated that pulling in orders may have been a contributing factor for the shortfall in the 2016 third quarter backlog.

62.     CW stated that in the period leading up to CW's departure CW had definitely *not* been encouraged by the outlook for the third and fourth quarters of 2016, both because of the poor sales numbers under McDonald and also because of how Jamie Ulloa ("Ulloa"), the General Manager of Supreme's Texas division, had been running the Texas facilities.  CW described how Ulloa had been "pulling things in and out" and doing other things to "make numbers" that the two prior General Managers CW had reported to had not done.  CW described management as "kind

of shady," engaging in practices that seemed to CW like "fudging the numbers" by "moving things in and pushing out" things.  For example, CW recalled that production estimates would include orders for which the chassis had not yet been received and were not going to be received in that period.  When such an order could not be completed during a specific month, it would be moved into the pipeline for the ensuing month.

## V.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

63.    Throughout the Class Period, Defendants made material misrepresentations regarding the composition of their customer base and how the cyclical nature of Supreme's business affected its backlog.  Specifically, Defendants repeatedly stated, that fleet orders typically occur in the first half of the year.  Defendants made clear that fleet customers ordered on regular cycles.

64.    As described herein, backlog was the most significant indicator of future performance for Supreme, and it was widely discussed with investors and analysts.  In the 2015 third quarter, Supreme reported a backlog that was anomalous in both size and source, yet Defendants stated that the source of the backlog was ordinary business, *i.e.*, not fleet customers. In reality, Defendants made a series of materially false and misleading statements, in addition to omitting to disclose material facts, concerning the 2015 third quarter backlog.  Subsequently, Defendants did not correct their prior misstatements and omissions, choosing instead to reinforce them through additional misstatements and omissions while selling massive amounts of stock.

### 1.    2015 Third Quarter False and Misleading Statements

65.    On October 22, 2015, Supreme announced a 2015 third quarter backlog of $74.4 million, which was 46.7% higher than the $50.8 million backlog in the 2014 third quarter.  The increase in backlog was attributed to stronger sales.  Weber was quoted in the press release: "The

combined performance of our sales and operations teams resulted in strong third quarter orders for trucks and specialty vehicles.  It is very encouraging to realize notable year-over-year growth in our backlog."

66.     The foregoing statements were false and misleading when made, because Defendants failed to disclose that the source of the "notable year-over-year growth" was actually anomalous fleet orders that are typically received in the first and second quarters.

67.     The following day, on October 23, 2015, the Individual Defendants hosted an earnings call.  Again, Weber attributed the large backlog to strong order activity:  "***As a result of the strong order activity, our order backlog at the end of the third quarter was $74.4 million, which is 47% higher as compared to the third quarter of 2014.***"

68.     On the same call, the Individual Defendants were asked to "give a little color in terms of one when your backlog is typically realized in terms of how far out in the future and then also maybe retail versus fleet breakdown[.]"  In response, Weber stated:

> I'll talk a little bit about the timeframe of that backlog flowing through.  ***Set aside the rental fleet business because, as you know, we typically are quoting that and securing those orders in the fourth quarter and they don't flow through typically until the second quarter.***  So that has a little bit longer-than-normal cycle time on the rental business.  ***None of that really is in our backlog right now.***

69.     Later, on the same call, the Individual Defendants were asked directly about the source of the increased backlog.  Weber's response made no mention of the anomalous fleet orders:

> **<Q - James R. Wilen>**: Hey, fellas.  Nice quarter.  You mentioned that the lead times in medium-duty chassis availability was extended during the quarter.  Is that the reason that the backlog has increased so much because you're unable to get some of these things out that you thought you could?

> **<A - Mark D. Weber>**:  Well, that's a little bit of, but our backlog is going to – as grow the business, I mean let's say, for example, if you're shipping $1 million a day and you've got 60 days in your backlog, you've got a $60 million backlog.  If you're only shipping $500 million a year, you've got half of that in your backlog in that same cycle time.  ***So, as the company grows and our shipments per day grow, our backlog is going to have to get a little bit larger to sustain that level of business.***

> *I would say that a lot of our growth this year has been in the medium-duty side.  So, I would say that our backlog is a little bit more tilted towards medium-duty than light-duty.  So that has extended sort of that cycle time a bit.*

70.     The foregoing statements in ¶¶67-69 were false and misleading at the time they were made.  As alleged herein, in their statements regarding the source of the large 2015 third quarter backlog, Defendants failed to disclose that the large backlog was actually the result of "two large fleet replacement orders and the timing of an annual fleet account order received during the third quarter," which, based on the cyclical nature of Supreme's business, were atypical of the third quarter.  More specifically, Defendants characterized the source of the large backlog as ordinary business and asked investors to "[s]et aside the rental fleet business" when, in fact, Defendants knew that reported backlog was an anomalous result from fleet orders that was out of line with historical precedent, *i.e.*, they did not occur during the first or second quarter.

### 2.     2015 Fourth Quarter False and Misleading Statements

71.     On February 18, 2016, Supreme announced its financial results for the 2015 fourth quarter and full year.  The next day, on February 19, 2016, the Individual Defendants discussed Supreme's financial results on an investor conference call.  While Weber acknowledged "the choppy outlook of some economic indicators," the message from Supreme continued to be decidedly optimistic in terms of backlog:

> Our order backlog increased to just over $100 million – just under a $100 million by the end of December.  This is 32% higher than at the end of September of 2015 and up 23% from the end of 2014.  *The backlog growth is a direct result of improved close rates on our deal pipeline and more consistent execution from our operations' teams.  On a year-over-year basis, we posted solid double-digit increases in new orders during 2015, which is reflected in our stronger backlog.*

72.     The foregoing statement was misleading when made because Defendants failed to disclose the true source of the anomalous third quarter backlog when comparing it to the fourth

quarter results.  Because Defendants mischaracterized the backlog, investors and analysts were not provided with the proper metrics to evaluate Supreme's financial outlook.

### 3.      2016 Second Quarter False and Misleading Statements

73.      On July 21, 2016, Supreme announced its financial results for the second quarter and first half ended June 25, 2016.  The Individual Defendants held an investor call the following day, on July 22, 2016.  As noted, analysts focused on Supreme's backlog as an indicator of the Company's success, and this investor call was no different.  On the call, one analyst recognized that Supreme was operating in a "slowing industry" and asked about the best way to look at gross margin for the second half of 2016 and the beginning of 2017 if demand continued to slow.  In answering this question, defendant Long stated:  "And just to finish up the commentary on the gross margin, . . . obviously, we have some serious leverage on our fixed cost with the increased volume as you look at the backlog, *the backlog is going to settle more towards the way it looked Q3 last year.*"

74.      The preceding statement was false and misleading at the time it was made.  As alleged herein, the Individual Defendants knew that the large 2015 third quarter backlog was attributable to fleet orders typically placed in the first and second quarters.  In their statements regarding backlog, Defendants failed to disclose that demand for the Company's products was slowing, and that Supreme was having trouble meeting its sales goals.  As noted above, CW reported that there were "signs in July of a sales shortfall," yet Supreme did nothing to warn investors, and continued to paint a positive outlook for the third quarter.  In addition, Weber later acknowledged that "industry-wide growth in commercial truck sales decelerated during the summer months."

75.      Moreover, the timing of significant inside sales demonstrates that Company insiders were aware that the preceding misrepresentation was causing the price of Supreme shares

to be artificially inflated.  Specifically, between July 22, 2016 and the end of the Class Period, Company insiders sold a total of 530,174 shares, netting proceeds of approximately $9.3 million. During this time period, Weber sold 30,000 shares, netting $499,400, while Long sold 10,000 shares and netted $166,100.

### 4.      Analysts Adopted the Materially False and Misleading Statements

76.     The foregoing false and misleading statements were material, as evidenced by the fact that analysts adopted Supreme's statements and made recommendations based on them.

77.     For example, based on the Company's disclosures, in an August 26, 2016 analyst report titled, "Supreme Industries – A Value Play With Accelerating Business Momentum," Singular stated, "Robust demand for trucks coupled with superior execution capabilities is driving strong growth in revenue for Supreme [], which in turn is aiding the company to enhance gross margins through improved plant utilization."  The report also stated, "Notwithstanding moderation of demand growth for work trucks in Q2:16 particularly in late June 2016, we believe Supreme will continue to outperform the overall growth forecasts for 2016 and beyond."  Based on the Company's representations, Singular rated Supreme as a "Buy" with a 12-month target price of $20.00.

## VI.    THE TRUTH IS REVEALED: SUPREME DISCLOSES DISAPPOINTING BACKLOG FIGURES, SHARE PRICE PLUMMETS

### A.      Supreme Discloses Backlog Figures that Contradict Prior Representations

78.     On October 20, 2016, Supreme issued a press release after the market closed announcing financial results for the third quarter and nine-months ended September 24, 2016. Even though the Company announced that net income increased by 79% on 15% higher sales, investors seized on a disclosure relating to the Company's backlog significantly missing the mark. More specifically, Supreme announced, "***At the end of the third quarter of 2016, order backlog***

*was $58.1 million, which was down from the $74.4 million in order backlog at the end of last*

*year's same quarter.  The timing of several large orders increased the backlog at the end of the*

*third quarter 2015*."  The backlog decline from $74.4 million to $58.1 million translates to an

approximate 22% decline.

79.     As discussed above, Supreme represented its "backlog" metric as the surest

indicator of the Company's future revenues.   And the Company repeatedly used the backlog

figures to allay investor concerns regarding the Company's cyclical revenue cycle.  In the press

release, Weber also acknowledged, for the first time, that "industry-wide growth in commercial

truck sales decelerated during the summer months" of 2016.

80.     Not surprisingly, the unexpected shortfall in sales backlog was the focus of the

investor conference call held the following morning, on October 21, 2016, to discuss Supreme's

financial results.  At the outset of the call, Weber acknowledged that reported backlog figures were

lower than previously indicated.  More specifically, he stated:

> *Order backlog at the end of the quarter was $58.1 million compared with $74.4*
> *million at the same time last year.  The lower backlog comparison is due to two*
> *large fleet replacement orders and the timing of an annual fleet account order*
> *received during the third quarter of last year.  The current backlog position [ph]*
> *follow (05:37) reduction from last year is in line with our historical third quarter*
> *backlog average since 2011.*
>
> Orders for work trucks year-to-date remain better than 2015 actual orders and ahead
> of our internal plan.  Our third quarter 2016 retail truck orders were very solid,
> representing our second best third quarter order level since 2011, and only eclipsed
> by very strong bookings in the third quarter of 2015.

81.     Not only did the Company reveal that the 2016 third quarter backlog was materially

below the 2015 third quarter backlog, contrary to what management had previously led the market

to expect, but management also admitted for the first time that the 2015 third quarter backlog figure

had been inflated by several one-off events.

82.     During the financial recap portion of the call, Long tacitly acknowledged that "fleet orders" during the quarter were disappointing.   More specifically, Long attempted to spin the "higher proportion of retail product in [Supreme's] backlog entering this year's third quarter" as a contributor to margin improvement as opposed to evidence that fleet demand from large customers failed to meet expectations.

83.     During the question and answer portion of the call, Weber distanced himself from prior representations that 2016 third quarter backlog would approximate 2015 third quarter backlog.   In response to a question regarding the Company's performance bright spots, Weber attempted to spin the prior year's backlog as anomalous, "***Our backlog was in good shape going in comparably.   Again, last year's backlog was one of our stronger periods going into the third quarter.***   We were about on par with that.   So, we had a solid backlog going in the quarter."   Weber, however, failed to acknowledge that the backlog ***was actually 22% below the prior year*** or that Long previously indicated that "***the backlog is going to settle more towards the way it looked Q3 last year***" during the previous July 22, 2016 investor call.   Analysts on the call did not accept such obvious spin tactics.

84.     During the call, the Individual Defendants were forced to acknowledge that the lack of orders from fleet customers weighed heavily on the sales backlog, despite attempts to spin the strength of retail sales.   In response to a question concerning major customer demand, Weber specifically observed:

> ***Yeah, for next year, I was talking to a area VP with a major leasing company on the West Coast yesterday.***   And we were talking about just general business. And he said in his area – now, again, that's a region not the entire United States.   ***But he said that in the medium duty, light duty side, they're pretty much flat right now year-over-year.***

<div align="center">*     *     *</div>

*We saw some of the rental accounts pull back pretty hard, Ryder, who's a public company, they pulled back pretty hard on their rental buy for 2016.  So that will give us a little bit of an indication.*  But like I said, our retail orders in the third quarter of this year was our second best third quarter since 2011.  *So we're not – obviously, we'd love to have a bigger backlog.  I don't know who wouldn't, but we're not terribly concerned about our position right now.*

85.     In response to a question regarding market share in a flat market, Weber again attempted to evade discussion of how Supreme previously misrepresented anomalous fleet orders during the 2015 third quarter and how the Company recognized that internal sales projections were wildly optimistic and needed to be recast downward:

*Well, Jamie, this is Mark Weber.  Like you said, there's no data out there being tracked.  We have some accounts.  We look at customer accounts.  We had some accounts that didn't buy this year.  We didn't necessarily lose the business.  They just didn't buy, as I indicated.  And regionally, we have pockets that are stronger than others. . . .*

86.     As discussed above, the Company's backlog shortfall was not attributable to certain customers deciding to either delay or not purchase products from Supreme during the quarter. Rather, efforts to "pull forward" sales to meet revenue goals and previously misrepresented backlog figures contributed significantly to the backlog shortfall for the 2016 third quarter. Defendants were unwilling to acknowledge these internal concerns, however, as doing so would call into question future revenues (and hamper their efforts to continue selling their stock at inflated prices).  Indeed, during the same call, Long fielded a question that directly attempted to link the reduced backlog figure to Supreme's anticipated revenue and provided a response that reinforced that the Company could reasonably expect fleet business to pick up *only* during the first or second quarter of 2017.

**Q – Wolf Joffe EVR>**:  Okay.  So, $72 million in truck revenue versus backlog at the beginning of the quarter of $75 million to $76 million with backlog at $58 million.  Does that mean Q4 revenue is roughly around $58 million, call it $56 million?

**A - Matthew W. Long>**:  That would then ask me to forecast and we don't have 100% throughput.  *What we typically say in the quarters that we're not running fleet business, our backlog is roughly 90 days business.  So, it should be somewhere in that realm.  Without really getting into the details of what we have in the backlog that may have some longer-term business and then as we book fleet business*, and Mark's talked about that a little bit, those generally spin into first and second quarter of the next year.

87.   Although Defendants were reluctant to address the implications of the backlog shortfall and its root causes, investors and analysts seized on the information, recognizing the long-term implications of the previously touted backlog figures coming in below target.

**B.     Analysts Link Supreme's Disclosure of Disappointing Backlog Figures to Stock Price Decline**

88.   Once the truth concerning the decline in Supreme's backlog was revealed, investor confidence in Supreme was shattered and an immediate decline in the price of Supreme shares ensued.  On October 21, 2016, the first day of trading after the news became publicly available, Supreme shares fell $4.28 per share, or over 23.8%, from its previous closing price of $17.96 to close at $13.68 per share on extremely high trading volume of more than 1.6 million shares (compared to average trading volume of approximately 150,000 shares per day).  The intra-day low was $13.29.

89.   On the next trading day, October 24, 2016, the share price declined from $13.68 to $11.30 – again on extremely high trading volume of more than 1.6 million shares.  This clearly demonstrates the impact that Supreme's disclosure of the truth regarding the source of 2015 third quarter backlog and the prior materially false and misleading public statements and omissions of material facts had on the market's assessment of the value of Supreme's stock.  This sharp and immediate market reaction is an extremely practical and clear indicator of materiality.

90.     Analysts directly attributed the price decline to the material shortfall in backlog. For example, on October 22, 2016, Cliffside published a research note entitled "The Party Is Over For Supreme Industries, Inc."  The analysts observed:

> We were anticipating a strong third quarter and that's just what Supreme Industries has delivered.  We also expected a somewhat soft Q3 backlog.  ***The magnitude of the Q3 backlog weakness caught us off guard though.  Backlog of $58.1mil was down 22% year-over-year (yoy) and substantially weaker than we anticipated.***

91.     The shortfall in backlog led Cliffside to revise its revenue forecast and valuation for Supreme, and observe, "When it comes to cyclicals, a good rule-of-thumb is that once everything looks like it is going perfectly and the future couldn't look any brighter, that's when you sell.  ***Based on Q3 backlog, it looks like the party's over for [Supreme]***."  In a section of the report entitled, "Backlog Falls Off of a Cliff," the analysts provided a quantitative assessment as to why they believed the "party" was over:

> ***To get another perspective on how bad the $58.1mil in backlog for the third quarter really was, we compared revenue to backlog from the prior quarter going back to 2010.  Since 2010 revenue has only been higher than the previous quarter's backlog in two quarters:  Q2 and Q3 2014.***  In those quarters revenue was only 2% and 5% higher than backlog from the prior quarter.  We are now currently estimating revenue of $65mil for Q4 as can be seen to the far right of the chart below.  If [Supreme] reaches $65mil in revenue for the 4th quarter they will be 12% above the Q3 backlog.  ***This has never been done as far as we are aware.***
>
> Based on our $65mil revenue estimate for Q4, we are currently modeling an earnings DECLINE for Q4 on a yoy basis.  For Q4 our current estimate is $.19c per share in continuing operating income vs. $.22c per share last year.  We also note that to reach $.19c we are modeling for a gross margin *improvement* in Q4 to 22% vs. 21.7% yoy despite a revenue estimate that is $2.7mil lower than last year's Q4.  ***It would appear there is downside risk to our revenue and earnings estimates.***

92.     The following chart included in the Cliffside report provides clear evidence of the connection between Supreme's backlog and quarterly revenue in subsequent quarters.  More specifically, the chart illustrates that if Supreme's quarterly backlog increased, revenues were likely to increase in subsequent quarters.

30



93.     In addition, and as discussed below, Cliffside drew a direct connection between backlog shortfalls and that Company insiders (including ten out of twelve board members) dumped 23% of their shares during 2016.

94.     Other research analysts drew similar conclusions between the stock price decline and the Company's reported backlog.  On October 24, 2016, Singular published a research note concluding, "*End of quarter backlog and reduced guidance for industry demand growth implies we will need to reduce estimates*. . . .  Order backlog at quarter end was $58.1 million, down from $74.4 million in the prior year quarter.  *Timing of several large orders increased backlog in Q3:15*."

95.     On November 16, 2016, Singular published a follow-on research report that again focused on the surprise decline in the Company's reported backlog and noted, "*Order backlog at quarter end was $58.1 million, down from $74.4 million in the prior year quarter.  The lower*

*order backlog is attributable to two large intermittent orders and the timing of an annual fleet account order during Q3:15.*"  While Singular recounts management discussion regarding how the reported backlog falls in line with backlog figures from prior quarters, the report also acknowledges that the disclosure of the anomalous source of the 2015 third quarter backlog caused a severe stock price reaction.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

96.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own names, during the Class Period were materially false and misleading.  Defendants knew that prior backlog figures were anomalous and that anticipated orders were lagging.

97.    Defendants, by virtue of their receipt of information reflecting the true facts regarding Supreme, their control over, and/or receipt and/or modification of Supreme's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including defendants Weber and Long.

98.    More specifically, based on the frequent ongoing dialogue between Defendants and their customers, Defendants knew that prior representations concerning the Company's backlog were materially misleading and omitted material facts.  Defendants, however, did not disclose these concerns to investors, and instead, created the materially misleading impression that the

Company's backlog was strong and that the figures reported to investors accurately indicated that future revenues would remain strong.

### A. Senior Supreme Executives, Including Weber and Long, Were Heavily Involved in the Company's Sales Process

99. Weber and Long, because of their positions at Supreme, controlled the contents of Supreme's public statements during the Class Period. Weber and Long were provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance, and had the ability and opportunity to prevent its issuance or cause the information to be corrected. Because of their positions and access to material non-public information, Weber and Long knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Supreme's corporate statements and is, therefore, responsible and liable for the representations contained therein.

100. In addition, the scienter of the Individual Defendants is further supported by the fact that, as disclosed in the Company's 2015 Form 10-K, the Company had only 1,400 employees as of December 31, 2015, only 70 of whom focused on sales. This raises a strong inference that Weber, the CEO, President, and a board member, and Long, the CFO, were intimately familiar with all material aspects of the Company's operations and sales pipeline.

101. Further, as alleged above, Weber, Long, and other senior executives worked to implement a series of software and lean manufacturing initiatives that were designed to centralize operations and allow senior management to rationally address customer demand and business strategy. Collectively, Supreme executives sought to instill a spirit of "kaizen" that aimed to ensure employees at all levels of the Company would work together for continual improvement.

In addition, Weber repeatedly discussed his personal involvement with significant fleet customers, noting that he was "out in the front of" customers.

102.   This is particularly true for the anomalous orders during the 2015 third quarter, which were misleadingly described to investors.   The Individual Defendants recognized that similar backlog figures were unlikely to be replicated during 2016.

103.   CW confirmed the heavy involvement of senior Company executives.   For example, Weber and other senior Supreme executives participated in weekly sales calls with the regional offices where sales shortfalls were discussed.   Accordingly, this is not a case where a fraud occurred at a distant subsidiary or was committed by lower-level employees who did not report directly to senior management.   Rather, defendants Weber and Long were acutely aware of Supreme's operations, and of its successes and failures.

104.   In any event, Defendants have provided no indication that they were unaware of the true nature of the 2015 third quarter backlog.   In fact, in light of the Company's prior statement about management's intimate involvement in the sales process, the most plausible inference is that Defendants knew the true nature of the 2015 third quarter backlog when first announced.

**B.     Suspicious Insider Selling by Senior Executives and Board Members Also Creates a Strong Inference of Scienter**

105.   As discussed herein, Defendants knew that "the timing of several large orders" influenced their backlog at the end of third quarter 2015.   Company insiders recognized that this backlog figure was misleading but continued to make bullish statements indicating that subsequent results would match the anomalous 2015 third quarter results.   In addition, Defendants omitted to disclose material facts that would otherwise allow investors to piece together the truth.

106.   During the Class Period, the Individual Defendants and other insiders, including senior executives, such as Oium, and Company directors, were motivated to engage in the course

of conduct described herein to enrich themselves with insider trading proceeds.  These insider sales were designed to capitalize on the inflated price of Supreme stock before the truth emerged and the share price plummeted.  Collectively, insiders netted over ***$11 million*** during the Class Period, with approximately $9.3 million, or more than 75%, of that amount resulting from transactions occurring during the three-month period from July 22, 2016 through October 21, 2016, which corresponds to the slowdown in sales.[2]  Moreover, the fact that these transactions were not made pursuant to a Rule 10b-5 trading plan raises further questions as to the timing of the sales.

107.   In the aftermath of the Company's corrective disclosures, analysts seized upon the Company's insider sales.  For example, Cliffside determined that "[o]ut of the 12 members on the board, 10 have sold shares [in 2016]" and determined the 2016 sales equated to 23% of their total holdings.[3]  The widespread selloff among the Company's senior executives and directors further supports the inference that knowledge of Supreme's operational and sales challenges permeated the Company at the highest levels in direct contrast to the rosy disclosures provided to investors.

108.   During the Class Period, the Individual Defendants made substantial sales of Supreme stock.  Weber sold 50,000 shares, netting $752,058, and Long sold 10,000 shares, netting $166,100.  Had the Individual Defendants liquidated the same number of shares at the closing price of Supreme stock on October 24, 2016 (*i.e.*, the next trading day following the corrective disclosure), they would have earned substantially less (*i.e.*, Weber ($68,058 less) and Long ($29,300 less)).  Their individual transactions are summarized in the following chart.

---

[2]  Analysis of Class Period sales by Supreme insiders is derived from transactions disclosed in Forms 4 that Supreme filed with the SEC.

[3]  *See* Cliffside Research, "The Party Is Over For Supreme Industries, Inc.", *SeekingAlpha*, Oct. 22, 2016 (*available at:* https://seekingalpha.com/article/4013995-party-supreme-industries-inc).

| Individual Defendants' Class Period Sales | | |
|---|---|---|
| | Number of Shares | Proceeds ($) |
| Weber | 50,000 | $752,058.00 |
| Long | 10,000 | $166,100.00 |

109.   In addition, the majority of the Individual Defendants' Class Period transactions took place between July 22, 2016 and October 21, 2016, when it was increasingly apparent that Supreme's backlog, and future revenues, would not meet previously disclosed expectations.

110.   Moreover, this trading was not in line with the Individual Defendants' prior trading activity.  For the entire year prior to the Class Period, Weber and Long did not sell any stock, compared to the nearly $1 million in stock sales during the Class Period.   The individual comparison of pre- and intra-Class Period sales are summarized in the chart below.

| Comparison of Individual Defendants' Pre- and Intra-Class Period Sales | | |
|---|---|---|
| Period | Weber | Long |
| 10/22/2014-10/22/2015 | $0 | $0 |
| 10/23/2015-10/21/2016 | $752,058 | $166,100 |

111.   As shown, Weber and Long's Class Period stock sales were unusual in scope and timing, and dramatically out of line with prior trading.

112.   Moreover, profits from these trades were substantial relative to Weber and Long's salaries.  In 2015, Weber's salary was $441,346, and Long's salary was $266,423.  Although Supreme has not yet reported Weber and Long's compensation for 2016, based on their employment agreements as reported in the 2016 Annual Proxy Statement, Weber's base salary was $395,000, while Long's base salary was $225,000.

## VIII.   LOSS CAUSATION

113.   As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market by taking a course of action that artificially inflated the price of Supreme common stock and operated as a fraud or deceit on Class Period purchasers of Supreme common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When

Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Supreme common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

114.   As a result of their purchases of Supreme common stock during the Class Period, Lead Plaintiff and the Class suffered damages under the federal securities laws.   Defendants' omissions and false and misleading statements had the intended effect and caused Supreme common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $19.83 per share on September 19, 2016.

115.   The truth was revealed on October 20, 2016, when, as alleged above, the Company issued a press release following the market close announcing lower than expected backlog figures and re-characterizing the nature of the prior backlog.   As a result of the Company's October 20, 2016 corrective disclosures, Supreme's stock price plummeted nearly 24% on unusually heavy trading volume, falling from a close of $17.96 per share on October 20, 2016, to a close of $13.68 per share on October 21, 2016, causing millions of dollars in investor losses.   In the days that followed, Supreme stock continued to decline, sinking to $11.03 by October 28, 2016.

116.   The market's negative reaction to Supreme's October 20, 2016 revelations is demonstrated by the following chart:



117.   The timing and magnitude of Supreme's stock price decline from October 20, 2016 through October 21, 2016 negates any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of daily returns between Supreme stock and the Russell 2000 Index, an index reflective of broader market trends, as the revelation of the truth became known to the market:



118.   By concealing the adverse facts detailed above, Defendants presented a misleading picture of Supreme's business and future financial prospects.  When the truth about the Company was revealed to the market, the price of Supreme common stock fell significantly.  The declines in the price of Supreme common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who purchased Supreme common stock during the Class Period.

119.   In addition, as described above, analysts and investors directly attributed this price decline to the 22% decline in Supreme's backlog and recharacterization of the source of the 2015 third quarter backlog and Defendants' prior false and misleading statements.

120.   The declines in the price of Supreme common stock following the corrective disclosures were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to the market.  The timing and magnitude of the price declines in Supreme common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

121.   The damages suffered by Lead Plaintiff and the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Supreme common stock, while selling their own holdings, and the subsequent significant declines in the value of Supreme common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

122.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew that the statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Supreme who knew that the statement was false when made.

## X.   CLASS ACTION ALLEGATIONS

123.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all persons other than Defendants who were purchasers of Supreme common stock between October 22, 2015 and October 21, 2016, inclusive (the "Class").

124.   Excluded from the Class are Defendants herein, members of their immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

125.   The members of the Class are so numerous that joinder of all members is impracticable.  More than 15 million shares of Supreme common stock were outstanding during the Class Period.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Supreme and its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

126.   Lead Plaintiff will fairly and adequately represent and protect the interests of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

127.   Lead Plaintiff's claims are typical of the claims of the Class because Lead Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

128.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

129.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period were materially false and misleading;

c.   whether Defendants acted with scienter in making false or misleading statements during the Class Period;

d.   whether the price of Supreme common stock was artificially inflated during the Class Period; and

e.   the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## XI.   LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

130.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated upon omissions of material fact, which there was a duty to disclose.

131.   In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory.

At all relevant times, the market for Supreme common stock was an efficient market for the following reasons, among others:

      a.      Supreme common stock met the requirements for listing, and was listed and actively traded on the NYSE MKT, a highly efficient, national stock market;

      b.      as a regulated issuer, Supreme filed periodic public reports with the SEC and the NYSE MKT;

      c.      Supreme regularly communicated with investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.      Supreme was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

132.   As a result of the foregoing, the market for Supreme common stock promptly digested current information regarding Supreme from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Supreme common stock during the Class Period suffered similar injury through their purchase of Supreme common stock at artificially inflated prices, and a presumption of reliance applies.

## XII.   CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against All Defendants

133.   Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

134.   This Count is asserted against Supreme and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

135.   During the Class Period, Supreme and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   Supreme and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Supreme securities during the Class Period.

137.   Supreme and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Supreme were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts at Supreme, their control over, and/or receipt and/or modification of Supreme's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Supreme, participated in the fraudulent scheme alleged herein.

138. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Supreme personnel to members of the investing public, including Lead Plaintiff and the Class.

139. As a result of the foregoing, the market price of Supreme securities was artificially inflated during the Class Period. In ignorance of the falsity of Supreme's and the Individual Defendants' statements, Lead Plaintiff and the Class relied on the statements described above and/or the integrity of the market price of Supreme securities during the Class Period in purchasing Supreme securities at prices that were artificially inflated as a result of Supreme's and the Individual Defendants' false and misleading statements.

140. Had Lead Plaintiff and the Class been aware that the market price of Supreme securities had been artificially and falsely inflated by Supreme's and the Individual Defendants' misleading statements and by the material adverse information which Supreme and the Individual

Defendants did not disclose, they would not have purchased Supreme's securities at the artificially inflated prices that they did, or at all.

141.   As a result of the wrongful conduct alleged herein, Lead Plaintiff and the Class have suffered damages in an amount to be established at trial.

142.   By reason of the foregoing, Supreme and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the Class for substantial damages which they suffered in connection with their purchase of Supreme securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Mark D. Weber and Matthew W. Long

143.   Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

144.   During the Class Period, the Individual Defendants participated in the operation and management of Supreme, and conducted and participated, directly and indirectly, in the conduct of Supreme's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Supreme's business practices alleged herein.

145.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Supreme's financial condition and results of operations, and to correct promptly any public statements issued by Supreme which had become materially false or misleading.

146.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Supreme disseminated in the marketplace during the Class Period.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Supreme to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Supreme within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged herein which artificially inflated the market price of Supreme securities.

147.   Each of the Individual Defendants, therefore, acted as a controlling person of Supreme.  By reason of their senior management positions and/or being directors of Supreme, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Supreme to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Supreme and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

148.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Supreme.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.        Such other and further relief as the Court may deem just and proper.

## XIV.   DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

Dated: April 24, 2017                                **COHEN & MALAD, LLP**

*/s/ Richard E. Shevitz*
Richard E. Shevitz
   rshevitz@cohenandmalad.com
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593

*Liaison Counsel for Lead Plaintiff*

**BRAGAR EAGEL & SQUIRE P.C.**
Lawrence P. Eagel
   eagel@bespc.com
Jeffrey H. Squire
   squire@bespc.com
Melissa A. Fortunato
   fortunato@bespc.com
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506

**KIRBY McINERNEY LLP**
Ira M. Press
   ipress@kmllp.com
Thomas W. Elrod
   telrod@kmllp.com
825 Third Avenue, Floor 16
New York, NY 10022
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540

*Co-Lead Counsel for Lead Plaintiff*