**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re SUPREME INDUSTRIES, INC.     )
SECURITIES LITIGATION         )     NO. 3:17CV143PPS-MGG
                                       )

## OPINION AND ORDER

This is a class action against Supreme Industries Inc. and two of its officers for alleged violations of federal securities laws. The lead Plaintiff, Kenneth Fishman, purchased shares of Supreme during the relevant time frame. Fishman alleges that the Defendants engaged in a fraudulent scheme to artificially inflate Supreme's stock price by misrepresenting the true nature of the company's order backlog, which he claims is the company's surest indicator of future financial success. Fishman also claims that the Defendants provided a prediction of the company's future backlog even though they knew adverse facts that undermined the prediction. The Defendants seek dismissal of the complaint.

## Background

Here are the facts as told to me by Fishman in his amended complaint (as well as documents incorporated into it and public records), which I accept as true for present purposes. Supreme is a publicly traded company headquartered in Goshen, Indiana. [DE 53 at 10, ¶17.] It manufactures truck body parts for commercial and other speciality vehicles. [*Id.* at 5, ¶2.] The company is managed by a small cadre of key executives, which includes the individual Defendants in this case — Mark Weber, the Chief Executive Officer, and Matthew Long, the Chief Financial Officer. [*Id.* at 5, ¶3.]

Kenneth Fishman alleges that he purchased 3,000 shares of Supreme common stock in September 2016 at prices of $18.26 and $17.69.  [*Id.* at 9, ¶16; DE 19-2 at 3.] He sold all of his shares on November 9, 2016 at $12.08 and $12.03 per share, for a total loss of $12,570. [DE 19-3 at 2.] He brings this action on behalf of himself and all similarly situated purchasers of Supreme securities between October 22, 2015 and October 21, 2016 (the "Class Period"). [DE 53 at 4, ¶1.]

Supreme specializes in building truck bodies "to order," completing most of the production after a customer places an order. [*Id.* at 6, ¶5]. When an order is placed, it enters Supreme's "backlog," which is its unfinished work or customer orders that have been received but not yet completed. [*Id.* at 6, 18, ¶¶5, 42.]  When work is completed and shipped, Supreme records it as revenue and reports it as part of its net sales. [*Id.*] Supreme repeatedly stated that its backlog was a critical indicator of the company's current performance and the surest indicator of future revenue, and it disclosed its backlog figures to investors on a quarterly basis. [*Id.* at 6, 18, ¶¶5, 42, 44-45.]

Supreme serves a variety of customers, including national rental fleets, national and regional leasing companies, truck chassis dealers, and fleet operators. [*Id.* at 15-16, ¶35.]  The company divides its customers into three categories: retail, fleet, and other. [*Id.*]  Retail clients account for the most significant percentage of Supreme's annual sales, but these sales are spread across hundreds of accounts that may or may not purchase from Supreme again. [*Id.*]  Fleet customers, on the other hand, which include national truck rental companies such as Budget and Penske, are fewer in number but

spend more and typically place orders at regular intervals. [*Id.*] According to the Defendants, fleet customers include both rental fleet and other fleet operators. [DE 62 at 22 n.5.] Fleet orders are typically reflected in the first half of each year. [DE 53 at 17, ¶39.] Supreme repeatedly conveyed these trends to investors. [*Id.* at 21-22, 24-26, ¶¶55, 63, 67-69.] Supreme further disclosed this trend in its 2015 Form 10-K, stating that "Seasonality arises due to the Company typically participating in bids for large fleet contracts. If successful, the fleet orders generally require shipment of the truck bodies in the first and second quarters." [*Id.* at 17, ¶39.]

Supreme reports its financial results on a quarterly basis in a press release and SEC filing. These reports include Supreme's backlog at the end of each quarter. [*Id.* at 18, ¶44.] Supreme does not disclose any granular-level detail about the backlog, including the identity of its customers or the exact composition of the backlog. [*Id.* at 19, ¶47.] Supreme also holds a quarterly conference call with investors to discuss its results. [*Id.* at 13-14, ¶¶30-31.] These calls, which include both Weber and Long, begin with prepared remarks, but investors are also given the chance to ask questions during an unscripted question and answer portion. [*Id.* at 19, ¶48.]

On October 22, 2015, Supreme issued a press release announcing its results for the third quarter of 2015. [*Id.* at 24-25, ¶65.] This disclosure included Supreme's backlog, which was $74.4 million. [*Id.*] In its Form 10-Q filed with the SEC, Supreme provided additional information regarding the backlog, including that "[c]ompared with last year, new order intake was stronger in the third quarter of 2015 across both

retail and fleet work truck product lines." [DE 63 at 67.]

Supreme also held its quarterly earnings call. On the call, in his prepared remarks, Weber announced that its 2015 third quarter backlog was 46.7% higher than the 2014 third quarter. [DE 53 at 24-25, ¶¶65, 67.] Weber stated, "The combined performance of our sales and operations teams resulted in strong third quarter orders for trucks and specialty vehicles." Weber added that this "notable year-over-year growth" was "encouraging." [*Id.* at 24-25, ¶65.] Weber noted that they were "picking up some additional demand on the leasing side" from national rental companies including Penske, Ryder, and Budget. [DE 63 at 53.]

Participants on the call asked questions about the backlog. When asked for "a little color in terms of when your backlog is typically realized," Weber explained that lead times are generally longer for rental fleet orders than for retail and normal leasing business. [DE 53 at 25, ¶68; DE 63 at 52.] Weber added "[s]et aside the rental fleet business, because as you know, we typically are quoting that and securing those orders in the fourth quarter and they don't flow through typically until the second quarter ... none of that is really in our backlog right now." [DE 53 at 25, ¶68; DE 63 at 52.] Another analyst asked for the source of the increased backlog and whether it was attributable to extended lead times on medium-duty chassis availability. Weber responded that it was "a little bit" of the reason, but that "a lot of our growth this year has been in the medium duty side. I would say that our backlog is a little more titled towards medium-duty than light-duty." [DE 53 at 25-26, ¶69.]

4

On February 18, 2016, Supreme announced its results for the fourth quarter of 2015. Supreme reported "significantly improved financial results" for both the fourth quarter and 2015 as a whole. [*Id.* at 26, ¶71.] In addition, Supreme announced that its backlog as of the end of 2015 was $98.1 million, representing a more than 31% increase from the prior quarter. [DE 63 at 83.] This increase, Supreme said, was because of new order rates for trucks across both retail and national accounts, as Supreme secured new customers and add-on business from national accounts. [*Id.* at 112.]

During the fourth quarter earnings call, Supreme noted that the backlog included fleet orders, which were "pretty much flat," and it cautioned that "[r]ental fleet demand is expected to moderate somewhat for 2016." It also said that "rental demand also tends to be more sensitive to near term economic conditions." [DE 63 at 90.] Moreover, it indicated that because of the "choppy outlook of some economic indicators, we are keeping a vigilant watch on leading indicators and market conditions." [*Id.* at 89.]

Supreme next disclosed, on April 21, 2016, that its first quarter of 2016 results concerning its net sales, income, and gross margin had again improved. It also announced that its backlog had increased to $102 million. [DE 63 at 214.] Weber stated that the backlog provided "additional confidence that our regional sales teams are gaining traction with a broad range of retail end users and leasing channel partners," but he noted that "rental fleet orders were mixed, as some accounts are trimming expenditures." [*Id.* at 219.]

On July 21, 2016, Supreme announced its 2016 second quarter results. It reported

improved second quarter and first-half results, including improvements in its net sales, net income, and margins. [DE 53 at 26, ¶71; DE 63 at 274, 303.] Supreme's backlog was $75.5 million, which was an increase year-over-year. [DE 63 at 274.]

During the earnings call the next day, July 22, 2016, the Defendants articulated a somewhat pessimistic outlook for Supreme. They told analysts that Supreme had seen "some indications of demand moderation late in the quarter," it "had lower year-over-year fleet business," and it had "lost some business on the fleet side." [DE 53 at 28, ¶77; DE 63 at 280, 296.] The Defendants further disclosed that "ACT data reported that June medium-duty truck orders were down 10% sequentially from May and 1% below June 2015." [DE 63 at 280.] The Defendants also predicted "some softness in the NTEA numbers in May and June," saying that they were going to be "a little weaker." [*Id*. at 293.]

One analyst on the call noted the "slowing industry," and he asked for "a little kind of color in the best way for us with gross margin in the back half of the year" and 2017. [DE 53 at 27, ¶73; DE 63 at 284.] Long's response to that question forms much of the sum and substance of this case. Long told the analyst that "without giving guidance ... we had some serious leverage on our fixed cost with the increased volume as you look at the backlog, *the backlog is going to settle more towards the way it looked Q3 last year.* So I wouldn't expect the same level of leverage on fixed cost." [DE 53 at 27, ¶73.] Long went on to say that this "depends on how the volume comes out in the current quarter." [DE 63 at 284.] It is the italicized portion of this quote that is claimed

to be actionable.

On October 20, 2016, Supreme reported its third quarter 2016 results. Although higher net income and sales were reported, Supreme also disclosed that the backlog was $58.1 million, which was down from $74.4 million the previous quarter. [DE 53 at 28-29, ¶78.] Comparing third quarter 2016 backlog to the previous year (third quarter 2015), it had decreased 22%. [*Id.* at 8, 22, 28-29, 40, ¶9, 56, 78, 115.] In explaining the reason for the year-over-year decline in the backlog, Weber provided two reasons: first, although backlog at the start of the third quarter of 2016 was actually higher than at the same point the previous year, net sales were about $10 million higher this year versus last; second, the higher backlog from last year was due to "two large fleet replacement orders and the timing of an annual fleet account order." [*Id.* at 8, 26, 29, ¶9, 70, 81.] The Defendants acknowledged that the lack of orders from fleet customers weighed heavily on backlog. [*Id.* at 30, ¶84.] A corresponding press release stated that, "The timing of several large orders increased backlog at the end of the third quarter 2015." [*Id.* at 28-29, ¶78.] In the press release, Weber also acknowledged that "industry-wide growth in commercial truck sales decelerated during the summer months." [*Id.* at 29, ¶79.]

On the earnings call, Weber also explained that the "economy remains choppy," and that "[e]conomic indicators had turned more bearish during the summer months with several cross-currents resulting in delayed purchase decisions" by customers. [DE 63 at 353, 361.] Weber provided some reasons that optimism had been dampened, including "the lack of small business confidence, several weak manufacturing sectors,

7

limited export support, and the uncertainty of the November elections." [*Id.* at 363.] He further explained that the trucking industry was slowing and there was research suggesting that sales in 2016 would drop and projected growth for 2017 had been lowered from predictions of 1.8% to only 0.6%. [*Id.* at 354.] Weber also disclosed that Supreme had seen "some of the rental accounts pull back pretty hard," and he noted that his own discussions with multiple leasing companies and end users confirmed the caution created by the economic cross-currents. [*Id.* at 357-58.]

The day after the earnings were reported (October 21, 2016), a short seller named Cliffside Research issued a "Flash Alert," rating Supreme's stock as a "Strong Sell." [DE 53 at 21, 33-34, ¶¶52, 90-93.] The report noted the cyclical nature of the trucking industry and Supreme's valuation after experiencing "explosive earnings growth over the past year." [DE 63 at 469-88.] Supreme's stock price fell by $4.28 per share that day, or nearly 24%, from $17.96 to $13.98. [DE 53 at 32, ¶88.] The next trading day, the stock fell again in price by another $2.38, to $11.30 per share. [*Id.* at 32, ¶89.] But the stock rebounded rather quickly; by January 23, 2017, the stock was selling at the pre-decline price. [DE 63 at 498.]

## Analysis

The defendants have moved to dismiss the first amended complaint under Federal Rule of Civil Procedure 12(b)(6). The standard for deciding this motion is not the typical standard that applies in ordinary motions to dismiss. Rather, the Private Securities Litigation Reform Act ("PSLRA") provides that the complaint in a securities

8

fraud action must do two things: first, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Second, it must, "with respect to each act or omission, ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). Here, the required state of mind is scienter, meaning a mental state that involves an intent to deceive or defraud. *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, *(Tellabs II)*, 551 U.S. 308, 319 (2007).

The Supreme Court has established three guideposts in deciding motions to dismiss under the PSLRA:

> (1) Courts must "accept all factual allegations in the complaint as true."
>
> (2) Courts must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice ... The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."
>
> (3) Courts must, in determining whether the pleaded facts give rise to a "strong" inference of scienter, "take into account plausible opposing inferences."

*Id.* at 322-23. A "strong" inference of scienter is one that is "powerful or cogent." *Id.* at 323. It is not enough for the plaintiff to allege facts from which an inference of scienter rationally *could* be drawn. *Id.* The inquiry into whether the plaintiff has pleaded sufficient facts to infer scienter is "inherently comparative," and I must assess "[h]ow likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* To answer this question, I must consider "plausible, nonculpable

explanations for the defendant's conduct, as well as inferences favoring the plaintiff," bearing in mind, however, that the inference of scienter need not be irrefutable or even the most plausible of competing inferences. *Id.* at 324. A complaint in a Section 10(b) action will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

There are different standards for evaluating allegedly false statements depending upon whether the statement is one of historical fact as opposed to a forward-looking prediction. With respect to the former — statements of historical or present fact — scienter means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). By contrast, forward-looking statements are evaluated under an even stricter standard. In those cases, scienter requires "actual knowledge of falsity on the part of defendants," not merely reckless indifference. *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citing 15 U.S.C. § 78u-5(c)(1)(B)).

The amended complaint asserts two claims. The first claim arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. To state a claim for securities fraud under these provisions, the plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The second claim arises under Section 20(a) of the Securities Exchange Act of 1934, and it is brought against the Individual Defendants, Mark Weber and Matthew Long. Under Section 20(a), "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable..." 15 U.S.C. § 78t(a).

## Section 10(b) and Rule 10b-5

Broadly speaking, the first amended complaint alleges that two statements constitute material misrepresentations in violation of Section 10(b) and Rule 10b-5. The first are the statements concerning Supreme's backlog from the third quarter of 2015, in that they failed to disclose that the increase in the backlog was due, in part, to anomalous fleet orders and statements by the defendants creating the impression that, in fact, there were no fleet orders in the backlog at that time. The second category occurred on July 22, 2016 when Long told analysts in a conference call that Supreme's backlog would likely "settle more towards the way it looked Q3 last year." I will take up each of these in turn.

### 1. Third Quarter 2015 Statements

Liability under Section 10(b) requires the plaintiff to prove that the defendant either made a false statement of material fact or failed to make a statement of material

11

fact thereby rendering the statements that were made misleading. *Searls v. Glasser*, 64

F.3d 1061, 1065 (7th Cir. 1995). A fact is material if a substantial likelihood exists that a

reasonable investor would have viewed the disclosure of the fact as having significantly

altered the "total mix" of information available. *TSC Indus. Inc. v. Northway*, 426 U.S.

438, 449 (1976).

The lead Plaintiff, Fishman, claims that, although the third quarter of 2015

backlog disclosures were technically accurate, the statements were misleading because

they mischaracterized the source of the backlog as ordinary business, when in reality it

was due to atypical fleet orders. He also alleges that the Defendants made several

additional statements on calls that were false or misleading because they still had not

disclosed the true source of the "anomalous" third quarter of 2015 results.

The Defendants counter this theory on several grounds. They argue that they

did, in fact, disclose that the increased backlog included fleet orders, that fleet orders

are not anomalous because they can be received sporadically throughout the year, and

Fishman has not alleged why the backlog number reported would have been rendered

misleading by the purported failure to disclose that the backlog contained fleet orders.

Simply alleging that, because the Defendants failed to disclose the source of the

backlog, the statements they made regarding the backlog were rendered misleading is

not enough. Omitting one detail – even a significant one – doesn't render the whole

story inaccurate or misleading. Failing to include the breakdown of the backlog does

not render the backlog figure "so incomplete as to be misleading." *See In re Harley*

*Davidson Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 985 (E.D. Wis. 2009). Nor is the source of the backlog a fact that is inconsistent with, or calls into question, the report of the indisputably accurate backlog figure. *See Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) ("[O]mitting smaller details, even if investors might care about them, is not necessarily misleading."). In other words, Fishman fails to allege precisely how the backlog figure was rendered misleading, as opposed to simply lacking detail.

Related to the purportedly material omission, Fishman alleges that other statements by Weber on the call were false or misleading and painted a picture that the increase in backlog was due to "ordinary business." In particular, Weber stated "[s]et aside the rental fleet business, because as you know, we typically are quoting that and securing those orders in the fourth quarter and they don't flow through typically until the second quarter ... none of that is really in our backlog right now." [DE 53 at 25, ¶68.]

I fail to see Fishman's point. Weber's statement that there was no rental fleet business in the backlog right now doesn't preclude there being other fleet business in the backlog. Moreover, the SEC filings and public release expressly stated that "new order intake was stronger in the third quarter of 2015 *across both retail and fleet work truck product lines*." [DE 63 at 43 (emphasis added); *id.* at 111.]

But let's suppose for the moment that the omission was material and rendered the other statements misleading. There is another problem with the amended complaint, in any event. There is not a strong inference of scienter alleged. Recall that in

a securities fraud action, the Plaintiff must "with respect to each act or omission … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "That 'required state of mind' is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."  *Higginbotham*, 495 F.3d at 756.  The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

In an attempt to adequately plead scienter, Fishman alleges that the Defendants have presented backlog as a critical measure for investors and the surest indicator of performance.  Accordingly, when the Defendants represented that the 2015 third quarter backlog has increased and this increase was attributable to ordinary business, they knew that this information was material to investors.  This is enough, according to Fishman.  The Defendants disagree.  They claim that Fishman must show that Defendants knew that by not disclosing this material information their disclosures would be rendered misleading.  The Defendants have the better argument.

It is not enough to say that the Defendants knew an investor would think a fact is material and they still failed to disclose it.  A lot of facts may be material to an investor, but the company does not disclose them for one reason or another.  Absent a duty to disclose, it's when the failure to disclose these material facts renders what the company has told investors misleading that the omission becomes actionable.  *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001).  One way such a duty can arise is if

omitting some particular fact makes an existing statement misleading. *Id.* "The critical question" then is whether the material omission is the result of "an intent to deceive or a reckless indifference to whether the statements were misleading." *Makor Issues & Rights, Ltd. v. Tellabs, Inc. ("Tellabs III")*, 513 F.3d 702, 709 (7th Cir. 2008). Thus, the Plaintiff must show that the Defendants either intended to deceive or were recklessly indifferent to the fact that their omissions would make their representations misleading – not just that the Defendants knew, or should have known, they were withholding material information.

Based on this standard, I don't see any evidence suggesting a strong inference of scienter. The only evidence of scienter is that the Defendants repeatedly designated backlog as a critical metric and were aware that the investors relied on backlog in assessing the company's performance. I can't see how knowing that one metric is material and not disclosing it leads to the conclusion that the Defendants must have known, or should have known, that this failure to disclose would mislead investors. That just doesn't follow.

It's completely plausible to infer that the Defendants, even assuming the omission was material and they knew it, didn't think, nor should they have thought, that omitting the breakdown of the backlog would mislead anyone. After all, as Fishman acknowledges, the Defendants never disclosed granular detail concerning the backlog's component parts. [DE 53 at 6, ¶5.] And it's not as though the Defendants were omitting some fact that was directly in opposition to what they were reporting. *See*

*Anderson*, 140 F. Supp. 2d at 911 ("The perpetrator would probably omit something that is more likely to affect the market.").

In sum, based on the failure to detail how the statement was made misleading by omission and to adequately plead a strong inference of scienter, the claim against Supreme as it relates to the third quarter 2015 backlog statement must be dismissed.

*2. Second Quarter 2016 Prediction*

Fishman also claims that a later statement made by Long is actionable. On the second quarter of 2016 earnings call, in response to a question concerning the "slowing industry," Long stated "the backlog is going to settle more towards the way it looked Q3 last year." It seems obvious to me that Long's choice of words – "is going to..." – speak directly to the future. It's a prediction. This is important because, as noted above, forward-looking statements are subjected to a heightened scienter requirement: actual knowledge, not just reckless indifference. 15 U.S.C. § 78u-5(c)(B).[1]

"Forward-looking statements" include, among other things, statements containing a projection of revenues, income, earnings per share, and other financial items, as well as statements of future economic performance. 15 U.S.C. § 78u-5(i)(1)(A), (C). Some courts have analyzed the issue by asking whether the statements concern things about the present – the time at which the statement is made – (not forward-

---

[1]There's another reason this determination is important. If the statement is forward-looking, then, under the PSLRA, it is not actionable so long as it is accompanied by meaningful cautionary language. Although the Defendants have raised this argument, addressing it here is not necessary.

looking) as opposed to projections about the future (forward-looking). *Compare Panasuk v. Steel Dyanmics*, 2009 WL 5176193, at *8 (N.D. Ind. Dec. 21, 2009) (a projection based on incomplete information is forward-looking) *with Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) (lies about things a company already knows are not forward-looking).

Recall that Long's statement was made on July 22, 2016. In his off-the-cuff comment in the conference call, he is predicting what the backlog will be at the end of September, two and a half months later. This is the epitome of a "forward-looking statement" — a statement whose truth or falsity is discernible only by reference to future performance. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 n.7 (N.D. Ill. 2003) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999)). In other words, it was only after the company knew the third quarter 2016 backlog numbers could anyone possibly know whether Long's prediction that "the backlog is going to settle more towards the way it looked Q3 last year" was correct or not.

"[T]here is no securities fraud by hindsight." *Fulton Cty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Nor is there any Monday morning quarterbacking of a company's opinions. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). Predictions are inherently uncertain, and no prediction has a 100 percent probability of being correct. *City of Livonia*, 711 F.3d at 758. An opinion statement "is not necessarily misleading when an issuer knows but fails to disclose,

some fact cutting the other way."  *Omnicare*, 135 S. Ct. at 1329 (analyzing opinion statements in the context of a Section 11 securities claim); *see also Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (applying *Omnicare*'s reasoning to a projection).

It is true, however, that if the maker of the prediction knows, to a reasonable certainty, that the prediction is false, such predictions may be actionable.  *See City of Livonia*, 711 F.3d at 759.  The same goes for predictions in which the defendant is aware of factual information that would undermine their accuracy. *Lionheart Partners v. M-Wave, Inc.*, 923 F. Supp. 1085, 1089 (N.D. Ill. 1996).  But, to repeat, the required state of mind for forward-looking statements is higher than for those of historical facts.  With respect to a prediction, the plaintiff must plead facts giving rise to a strong inference that the person making the prediction had "actual knowledge" that the prediction was false or misleading when made.  15 U.S.C. § 78u-5(c)(1)(B)(1).

Fishman points to three pieces of evidence suggesting an inference of scienter: (1) the high-ranking positions of Weber and Long; (2) allegations made by a confidential witness; and (3) suspicious insider stock sales.  I will analyze each piece of evidence individually, as well as a whole.

The Plaintiff first claims that the Defendants' high-ranking positions at Supreme support an inference that Long knew the prediction was false or misleading.  They invoke the "core operations" doctrine.  Under this doctrine, "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance."  *Jones v. Corus Bankshares, Inc.*,

18

701 F. Supp. 2d 1014, 1028 (N.D. Ill. 2010). While there is no "group pleading doctrine" and, as a result, the Plaintiff "must create a strong inference of scienter with respect to each individual defendant," *Pugh*, 521 F.3d at 693, an individual defendant's position within the company is not irrelevant, *Jones*, 701 F. Supp. 2d at 1028-29. So, although I cannot presume scienter, "a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue." *Id.* at 1029.

Fishman claims that Weber and Long were intimately involved in the operations of the company, and this supports that they knew the true nature of the 2015 third quarter backlog. [DE 53 at 36-37, ¶¶99-103.] In addition, it is alleged that Weber and Long were aware of the company's successes and failures, including sales shortfalls. [*Id.* at 37, ¶103.] According to Fishman, because of this knowledge, the individual Defendants recognized that similar backlog figures were unlikely to be replicated during 2016, despite predicting this to be the case. [*Id.* at 37, ¶102.] He says this allows for in inference of scienter.

This analysis fails to connect the dots. Even if I presume that Weber and Long knew the true makeup of the third quarter 2015 backlog and of the sales shortfalls, that doesn't suggest that Long knew the prediction concerning the third quarter 2016 backlog was false when he made it. The context is also important here. Long was predicting a decline in backlog from the previous quarter – prefaced with comments about the "slowing industry" and "demand moderation." It's completely plausible that

his prediction accounted for these trends and for the fact that the 2015 third quarter backlog included orders that were perhaps atypical for that quarter. There is no allegation that, even in light of sales shortfalls and the individual Defendants' intimate knowledge about the company's operations, it was impossible for Supreme to match third quarter 2015 backlog numbers.

Plaintiff's second basis for inferring scienter is the allegations made by the confidential witness in this case. For starters, allegations from unnamed confidential sources "require a heavy discount." *City of Livonia*, 711 F.3d at 759. This is because such sources "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent." *Id.* Nevertheless, confidential sources are often "important sources for the allegations not only of falsity but also of scienter." *Tellabs III*, 513 F.3d at 711. The Seventh Circuit has approved of confidential sources as providing an inference of scienter and has identified several factors which strengthen the inference, including a large number of confidential witnesses, descriptions of their jobs that indicate they had first-hand knowledge of the facts to which they are testifying, corroboration by other sources, and the inclusion of their real names. *See id.* at 712.

Here's what we know about the confidential witness: she is unnamed and was allegedly employed as a Production Scheduler at Supreme's Texas facility during the Class Period. Her duties included production scheduling, managing operations, procurement, and working with the General Manager to prepare monthly budget and

goals. [DE 53 at 23, ¶59.] The confidential witness' work included tracking backlog for the Texas division. [*Id.*] According to the confidential witness, there were "signs in July of a sales shortfall." The confidential witness also described management at the Texas facility as "kind of shady" and "fudging the numbers" by "moving things in and pushing [things] out." [*Id.*] According to Fishman, Weber and other senior executives participated in weekly sales calls with the regional offices where sales shortfalls were discussed. [*Id.* at 37, ¶103.] He says that this observation, in conjunction with the individual Defendants' degree of involvement, undercut Long's prediction that "backlog is going to settle more towards the way it looked Q3 last year."

It's also worth noting that this unnamed confidential witness left the company in August 2016. [*Id.* at 23, ¶60.] She stated that she and others were concerned about the outlook for 2016 third quarter results because the Director of Sales for the Texas region was not "coming up with his numbers"; however, she "could not say exactly how far below his projections [the Director] had been" at the time of her departure. [*Id.*] There also is no allegation that the confidential witness had any knowledge of company-wide numbers, or even numbers that extended beyond this one facility in Texas. Nor is there any suggestion that the numbers in Texas are indicative of the numbers in other regions or for the company as a whole.

Looking to the factors that the Seventh Circuit has identified as strengthening the inferences I can draw from a confidential witness, some discounting of the import of the confidential witness' allegations is warranted. First, there is only one confidential

witness, as opposed to a larger number.  Second, while some weight should be given to the confidential witness based on her job description, which certainly indicates that she had first-hand knowledge of some facts relevant to the claim, it's clear that she doesn't have first-hand knowledge that's sufficient to support scienter.  In particular, she was aware of sales shortfalls at the Texas facility, but the complaint doesn't include any allegation that she knew company-wide numbers. Third, there is no corroboration by other sources.  Finally, the confidential witness remains unnamed.  Despite these shortcomings, the Seventh Circuit has implicitly approved of a single, unnamed confidential witness as supporting an inference of scienter, *see City of Livonia*, 711 F.3d at 759-60, though as described below, that case is vastly different from this one.

Even taking into account the confidential witness' allegations, their value is undercut by the Defendants' other statements on the second quarter 2016 earnings call. As Fishman would have it, the confidential witness' allegations support inferring that the company was having trouble meeting its sales numbers, and Long knew it.  But the Defendants *did disclose* facts supporting the confidential witness' allegations.  There were all sorts of things said in the conference call that suggested that caution should be taken. They said there was "some softness," that there had been "indications of demand moderation late in the [second] quarter," that the company had "lost some business on the fleet side," in addition to a slew of other comments painting a less-than-optimistic picture. [DE 63 at 280, 293, 296.]

What really undermines the value of the confidential witness' allegations is that

none is inconsistent with what Long predicted. There is no allegation that, even given the shortfall of tens of thousands of dollars at the Texas facility, Supreme would be unable, or even unlikely, to obtain the backlog numbers that Long predicted. Or that Long knew this. Indeed, Supreme's backlog in the second quarter of 2016 was $75.5 million. It's a stretch to say that a shortfall of tens of thousands of dollars would call into a question a prediction concerning a backlog of that size.

This stands is stark contrast to the confidential witness' allegations in *City of Livonia*, a federal securities suit against Boeing and two of its executives. The allegations of scienter in that case included those made by a confidential witness who was a Boeing employee with first-hand knowledge of product testing of a new Boeing airplane. The new plane had failed the testing, but the defendants continued to represent to the public that they believed the plane would fly soon. That confidential witness, according to the complaint, had direct access to internal communications regarding the test results, which included the defendants in that case. The communications purportedly demonstrated that the defendants knew the plane's first flight would be delayed, despite saying otherwise to the public. 711 F.3d at 758-60. The district court in that case denied the defendants' motion to dismiss, which the Seventh Circuit appears not to take issue with. *Id.* at 759-60 (noting that the complaint was eventually dismissed when it became clear that the confidential witness' allegations were actually false). All of this is to say that the confidential witness' allegations in our case – even if true – do not at all call into question Long's prediction – let alone, support

inferring that he knew it was false or misleading when he made it.

What's more, as the Defendants observe, the confidential witness' allegation that the management at the Texas facility were "kind of shady" may actually undercut the inference that Weber and Long knew about the shortfall. To the extent that the Texas facility management was "fudging the numbers," this could plausibly suggest that they were in fact hiding information from senior management, not providing it.

Finally, Fishman points to several insider stock sales that it claims strengthen the inference of scienter. "Trading by insiders during the class period, by itself, does not raise an inference of scienter." *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *18 (S.D. Ind. Jan. 4, 2016); *Silverman*, 2008 WL 4360648, at *13. However, a stock sale that is suspicious in scope and timing may support such an inference. *Pugh,* 521 F.3d at 695; *Vallabhaneni*, 2016 WL 51260, at *18. The key is that the trading was "unusual." *City of Austin Police Ret. Sys. v. ITT Ed. Servs., Inc.*, 388 F. Supp. 2d 932, 950-51 (S.D. Ind. 2005). "Unusual" in this context means that the trading was "well beyond the normal patterns of trading by those defendants." *Id.* (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98, 206 (1st Cir. 1999)). Moreover, the fact that the insiders retained significant holdings weighs against any inference of scienter. *City of Austin*, 388 F. Supp. 2d at 951 (citing *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999)).

It is alleged that the individual Defendants and other Supreme insiders – who are not named as defendants in this case – realized over $11 million in proceeds from their sales of Supreme stock during the Class Period, and that approximately $9.3 million of

that resulted from transactions during the three-month period corresponding to the sales slowdown. With respect to Weber and Long in particular, the Plaintiff notes that neither had sold a single share in the year preceding the Class Period. [DE 53 at 39, ¶110.] However, in the Class Period, Weber sold 50,000 shares, netting $752,058; Long sold 10,000 shares, netting $166,100. [*Id.* at 38, ¶108.]

Despite selling stock, both Weber and Long retained large amounts of Supreme shares. Weber ended the Class Period with 146,310 shares, and Long with 83,667 shares. As the Defendants point out, Long actually ended the Class Period with greater holdings than at the beginning, and Weber's holdings were 8.37% lower. [DE 63 at 501.] That both defendants retained significant holdings undermines the inference of scienter. *City of Austin*, 388 F. Supp. 2d at 951.

What is suspicious is that neither Weber nor Long sold any stock in the previous year before the Class Period. This strikes me as somewhat "unusual" and might bolster the relevance of Weber and Long's sales of stock during the Class Period for purposes of scienter. *See Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005). But this fact, standing alone, is not sufficient to support a strong inference of scienter. Beyond the one year prior to the Class Period, I have no information before me about Weber and Long's selling history, even though Long has been with Supreme since 2011 and Weber since 2013. [DE 63 at 424-25.] It may be the case that the previous year in which they sold no stock was actually unusual. And I can't say that selling some stock in one year, after having sold no stock in the prior year, is so "dramatically out of line with prior

trading practices" that it rises to the level of inferring scienter.  *See Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003) (quoting *In re Silicon Graphics, Inc.*, 183 F.3d at 986).

It's also somewhat suspicious that Weber and Long both sold stock in late July of 2016, when the Plaintiff alleges signs of a sales shortfall were starting to materialize – but after Long made his prediction. [DE 63 at 501.] Weber sold 30,000 shares over three days from July 27 to July 29, 2016, and Long sold 10,000 shares on July 29, 2016. [*Id.*] But Weber sold almost as much – 20,000 shares – in May of 2016, before the Plaintiff alleges that there were any signs of a shortfall. [*Id.*] But again, viewing these sales in context, and keeping in mind that Weber's holdings were greater at the end of the Class Period than at the beginning, and Long's were only 8.37% lower, I don't see a strong inference of scienter based on the timing of these sales.

Even if no one allegation of scienter is particularly strong, it may be the case that, taking all of the pieces together, the inference rises to the level of strong, cogent, or compelling.  *See Tellabs II*, 551 U.S. at 322-23 ("The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard.") (emphasis in original).  However, considering the high-ranking positions of the individual Defendants, the confidential witness' allegations, the insider stock sales, and all of the other facts as a whole, I still don't find this to be the case.

It is also worth considering the context of the statement at issue here.  The off-

the-cuff statement was made in an unscripted portion of an earnings call in response to a question that the Defendants were not told in advance. This is different than a statement made in, say, a registration statement, a formal document that investors reasonably expect will not contain off-the-cuff judgments. *See Omnicare*, 135 S. Ct. at 1330. What's more, prior to making the statement, the Defendants disclosed a myriad of negative indicators, suggesting to investors that the outlook was choppy. These types of disclosures cut against an inference of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 540 (1st Cir. 2015) ("[R]ed flags were disclosed to the public, which negates the inference that defendants acted with scienter."). Finally, the prediction at issue strikes me as imprecise, not definite. Long's words – "settle," "more towards" and "the way it looked" – are vague enough that I suspect no reasonable investor hearing those statements would expect Long's prediction to be dead on. *See Searls*, 64 F.3d at 1067 (vague statements do not affect the mix of more detailed information upon which a reasonable investor typically relies). My point is that the context matters. Indeed, taking into account *all* of the facts leads me to conclude that the inference of scienter is neither compelling nor cogent.

The same is true when I consider whether the two broad types of statements at issue combine to paint a deceptive or misleading portrait of Supreme's business and prospects. Even this "holistic" view urged by Fishman fails to support a strong inference of scienter. Particularly when viewed comparatively to other plausible inferences I may draw, it does not appear that the inference of scienter is cogent.

Rather, the non-culpable inference – that Defendants withheld information that they had no reason to believe would mislead anyone and that, after accounting for and providing to the public a substantial amount of bad information, they made a prediction which turned out simply to not be quite true – is far more compelling.

Because I find that there exists no strong inference of scienter, Fishman's claim as it relates to the prediction must be dismissed.

### Section 20 Claim

Section 20(a) creates vicarious liability for a person who actually or potentially controlled the primary violator's acts. 15 U.S.C. § 78t(a); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 876 n.1, 881 (7th Cir. 1992). In order to state a claim under Section 20(a), plaintiffs must allege, among other things, a primary securities violation. *Harrison*, 974 F.2d at 881. I have already found that there is no primary violation. Therefore, Plaintiff's Section 20(a) claim must also be dismissed.

### Leave to Replead

The only remaining question is whether the dismissal of this case should be with or without prejudice. Given the demanding pleading requirements of PSLRA, the most prudent approach is to give Fishman and his lawyers an opportunity to amend the complaint in an effort to address the shortcomings in the present complaint as described in this opinion. Any amended complaint must be filed within 30 days. If Fishman chooses not to file an amended complaint, he can so notify the Court, and I will at that point convert the dismissal of the present complaint from a dismissal without prejudice

to one with prejudice so that an appeal can be taken if Fishman so chooses.

**Conclusion**

Based on the foregoing, Defendants' Motion to Dismiss [DE 61] is GRANTED.

All claims against the Defendants are DISMISSED WITHOUT PREJUDICE.  Any

amended complaint must be filed within 30 days of this Order.

**SO ORDERED.**

ENTERED: May 23, 2018.

_s/   Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT