**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re SUPREME INDUSTRIES, INC. | ) |
| SECURITIES LITIGATION | ) |
| | ) CAUSE NO. 3:17-CV-143-PPS/MGG |
| | ) |

# OPINION AND ORDER

In this securities fraud case, Defendants, Supreme Industries Inc., Mark Weber, and Matthew Long, have filed a motion to dismiss the second amended class action complaint. [DE 81.] I previously dismissed an earlier complaint but allowed the lead Plaintiff, Kenneth Fishman, to file an amended complaint which he timely did. After thoroughly reviewing the amended complaint I have again concluded that Fishman has failed to sufficiently allege, under the heightened pleading standards applicable to securities fraud cases, that Defendants made false or misleading statements, and he has also failed to raise a strong inference of scienter. I will therefore again dismiss the complaint but this time the dismissal will be with prejudice.

## Background

Much of the factual basis of this case has already been set out in my order dated May 23, 2018,[1] and for expediency sake, I will not repeat it here. During my analysis of this motion, I principally will focus on the new allegations in the second amended complaint. For present purposes, it is enough to say that Supreme is a company in the business of manufacturing truck body parts. The company manufactures specialized

---

[1]All references to "Op." are to the Opinion and Order granting Defendants' Motion to dismiss the Amended Class Action Complaint. [DE 76.]

commercial vehicles that are attached to truck chassis which Supreme purchases from

large manufacturers such as General Motors or Navistar.  According to the second

amended complaint, an important predictor of company performance is the size of its

backlog.  Generally speaking, "backlog" refers to unfinished work or to customer

orders that have been received but are either incomplete or in the process of

completion.

      Broadly speaking, there are two public statements at issue in this case that were

made by either Supreme or its executives that allegedly constitute material

misrepresentations in violation of Section 10(b) and Rule 10b-5: (1) a third quarter 2015

announcement by Supreme Industries regarding its backlog which Fishman claims was

misleading because they did not specify the composition of the backlog; and (2) a July

2016 prediction made by Supreme's Chief Financial Officer that the backlog for the

second half of 2016 was "going to settle more towards the way it looked Q3 last year."

[SAC, ¶ 94.][2]  I will take up each of these claims in order below.

## Discussion

      Before getting into the details of the allegedly false statements, let's begin with a

brief primer on the law that is applicable to this matter. As more fully set out in my

May 2018 order, pursuant to the Private Securities Litigation Reform Act ("PSLRA"),

the complaint must first specify each misleading statement and spell out why it is

---

[2]All references to "SAC" are to the second amended complaint, filed on July 13, 2018. [DE 80.]

misleading; and second, it must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind. 15 U.S.C. §§ 78u-4(b)(1), (b)(2). Why is the standard so onerous? It's because "Congress passed the PSLRA in response to perceived abuses in which issuers of securities would be sued based on little more than a significant drop in their stock prices after announcing bad news." *Schleicher v. Wendt*, 529 F.Supp.2d 959, 969 (S.D. Ind. 2007). As a result, the heightened pleading requirements are aimed at discouraging claims of "so-called 'fraud by hindsight.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 (N.D. Ill. 2004) (quoting *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001)).

In a case of securities fraud like this one, the plaintiff has to allege that the defendant made the false statements with an intent to deceive or to defraud. In other words, that is the "scienter" that must be alleged. *Tellabs, Inc. v. Makor Issues and Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 319 (2007); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (holding the required state of mind that must be pled is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.").

It is my job to determine whether the facts as alleged give rise to a "strong" (or powerful or cogent) inference of scienter. *Tellabs II*, 551 U.S. at 322-23. A "strong inference" is one that is "strong in light of other explanations." *Id.* at 324. In determining whether a strong inference of scienter has been sufficiently alleged, I may

not only draw on "inferences urged by the plaintiff" but must engage in a "comparative evaluation" and thus examine and consider "competing inferences rationally drawn from the facts alleged." *Id.* at 314. I must consider the totality of the facts alleged in determining whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Forward-looking statements — in other words, predictions — have a particularly strict standard, in which case scienter requires "actual knowledge of falsity on the part of defendants," not merely reckless indifference. *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citing 15 U.S.C. § 78u-5(c)(1)(B)).

Like the first amended complaint, there are two claims asserted in the second amended complaint. The first claim arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. To state a claim for securities fraud under these provisions, Plaintiff must plead: "a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

The second claim, brought against the individual Defendants, Mark Weber and Matthew Long, arises under Section 20(a) of the Securities Exchange Act of 1934. Under this section, "[e]very person who, directly or indirectly, controls any person liable

under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable . . . ." 15 U.S.C. § 78t(a).

Before turning to the new allegations, I pause to address Fishman's comment that Defendants have attached 56 documents to the Appendix. [DE 84 at 13 n.3.] Fishman initially implies that this is an "unscrupulous practice" on a motion to dismiss a securities case. [*Id.*] Nonetheless, he has not moved to strike any documents or identified any specific exhibit which I should not consider. Additionally, Fishman does not object to the documents incorporated into the second amended complaint and doesn't object to Defendants' references to SEC filings provided that they are not relied on for the truth of the matters asserted therein. [*Id.*] *See In re Shopko Sec. Litig.*, No. 01-C-1034, 2002 WL 32003318, at *2 (E.D. Wis. Nov. 5, 2002) (finding on a motion to dismiss securities fraud claims that courts may consider SEC filings "only to determine what disclosures the defendants made," not "for the truth of the disclosures contained therein"). This is appropriate because typically, when courts take notice of documents in securities fraud cases, courts "consider the documents for a non–hearsay purpose - *i.e.*, for the notice that statements in the documents provided concerning certain risks, as it relates to fraud or reliance questions - as opposed to for the substantive truth of statements in the documents." *ABN AMRO, Inc. v. Capital Intern. Ltd.*, No. 04 C 3123, 2007 WL 845046, at *8 (N.D. Ill. Mar. 16, 2007). Therefore, I will not consider the attached documents for the truth of the matters asserted within, but I will consider

them for non-hearsay purposes.

<strong>The Third Quarter 2015 Statements</strong>

**1.      Were the Third Quarter 2015 Statements False or Misleading?**

As noted above, liability under Section 10(b) requires the plaintiff to prove that

the defendant either made a false statement of material fact or failed to make a

statement of material fact thereby making the statements that were made misleading.

*Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995).  A fact is material if a substantial

likelihood exists that a reasonable investor would have viewed the disclosure of the

facts as having significantly altered the "total mix" of information available.  *TSC Indus.,*

*Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

With the second amended complaint, Fishman attempts to shore up his

argument that the third quarter 2015 backlog announcements were misleading because

they did not disclose further details about the backlog composition.  In other words,

while Fishman has to acknowledge that the backlog disclosures were technically

accurate, he continues to contend they were misleading because of what the defendants

*did not* disclose: that the anomalous backlog was the result of "two large fleet

replacement orders and the timing of an annual fleet account order received during the

third quarter."  [DE 84 at 15-16; SAC ¶¶ 10, 90, 101.]

I already directly addressed this argument in my May order and found:

> Simply alleging that, because the Defendants failed to disclose the
> source of the backlog, the statements they made regarding the
> backlog were rendered misleading is not enough.  Omitting one
> detail – even a significant one – doesn't render the whole story

inaccurate or misleading.  Failing to include the breakdown of the backlog does not render the backlog figure "so incomplete as to be misleading."  *See In re Harley Davidson Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 985 (E.D. Wis. 2009).  Nor is the source of the backlog a fact that is inconsistent with, or calls into question, the report of the indisputably accurate backlog figure.  *See Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill Sept. 23, 2008) ("[O]mitting smaller details, even if investors might care about them, is not necessarily misleading.").  In other words, Fishman fails to allege precisely how the backlog figure was rendered misleading, as opposed to simply lacking detail.

[Op. at 12-13.]

The additional allegations in the second amended complaint do nothing to cure this problem and Fishman still has not sufficiently alleged that the report of an accurate backlog number was misleading.  More allegations showing that the investors cared about Supreme's backlog, and sometimes asked questions about the backlog composition, have been added.  [SAC, ¶¶ 46-52.]  Yet, the first amended complaint contained similar allegations that "Defendants recognized that the Company's backlog provided insight into current and future performance," and during earnings calls, Supreme "drew direct connections between reported backlog and the Company's operations," Supreme focused on and discussed its quarterly backlog which gave the "metric a higher level of materiality to investors," and the backlog was a "primary indicator" of Supreme's current and future performance.  [FAC, ¶ 45.][3]

The first amended complaint also alleged that "investors consistently pushed"

_____

[3] All references to "FAC" are to the first amended complaint, filed on April 24, 2017. [DE 53.]

Supreme to provide additional backlog details during earnings calls, and that investors asked questions regarding the composition of the backlog. [*Id.* ¶¶ 48-50.] Merely piling on more allegations that the investors cared about the backlog does nothing to fix the problems with the first amended complaint — the true statement about the backlog is still not *misleading*. As I found earlier, just "knowing that one metric is material and not disclosing it" does not "lead[] to the conclusion that the Defendants must have known, or should have known, that this failure to disclose would mislead investors." [Op. at 15.]

Fishman argues that some of the second amended complaint's new allegations highlight Defendants' previous willingness to disclose the source of an anomalous backlog, thus trying to call into question the decision not to break down the backlog in the statements at issue. [DE 84 at 16.] Specifically, Fishman points to the disclosure of the third quarter of 2013 backlog to demonstrate Supreme's "ability and willingness to describe the source of anomalous backlog." [*Id.*] That disclosure reported "strong order intake in the third quarter led by significant fleet business and improved retail demand for the Company's truck bodies." [SAC, ¶ 53.] I'm not sure why this is held up as an example of a superior disclosure. It is very similar to the Q3 2015 SEC filings and public release disclosure (that Plaintiff alleges to be misleading), which expressly stated that "new order intake was stronger . . . across both retail and fleet work truck product lines." [Op. at 13; DE 83 at 43.]

Another addition to the second amended complaint relates to statements

occurring during the second quarter earnings call, on July 24, 2015. [SAC, ¶¶ 83-84.]

During that call, Long said, "[t]he backlogs are finally back to normal levels" and Weber

stated that, "[i]t's actually sort of balanced on the backlog side as it stands today,

because we flushed a lot of the fleet orders through in the second quarter." [*Id.*] But

nothing said on this call would suggest to a reasonable investor that there would be no

(or even few) fleet orders in the backlog at the end of the third quarter. To the contrary,

Supreme disclosed that the Q2 backlog was "sort of balanced" and that during Q2 it

had "strong" new order rates "across both retail and national accounts," including

"people who are big in the leasing, big in the rental" like "the Budgets, the Penskes, the

Ryders." [DE 83 at 30, 36.] I fail to see how anything said on the Q2 call renders the Q3

2015 disclosure that backlog included "new order intake [that] was stronger . . . across

both retail and fleet work truck product line" misleading by omission. [DE 83 at 43.]

Fishman again points to the allegations (which were in the first amended

complaint too) that a year later, on October 20, 2016, Supreme reported that it had an

unexpected third quarter backlog decline of 22%. It was at that time that Supreme first

disclosed that the large 2015 third quarter backlog was the result of "two large fleet

replacement orders and the timing of an annual fleet account order." According to

Fishman, putting these pieces of the puzzle together, along with the subsequent fall in

the stock price, constitutes "direct evidence" that the October 2015 disclosure must

have been misleading. [FAC, ¶¶ 9-10, 78; SAC, ¶¶ 10-11, 64, 99; DE 85 at 6, 18.]

I just don't see the characterization of the Q3 2015 backlog with greater

specificity in 2016 as direct evidence that the previous backlog statement *must* have been misleading; nor does the fall in stock price that occurred show that the Q3 2015 statement was a material misleading omission. First, the additional detail provided in 2016 was consistent with Supreme's Q3 2015 disclosure that backlog was up because "new order intake was stronger in the third quarter of 2015 across both retail and fleet work truck product lines." [DE 83 at 43; Op. at 15.] Second, if Supreme had no duty to disclose a more detailed breakdown of its backlog for Q3 2015, its decision to give additional detail in 2016 cannot retroactively create some disclosure obligation.

Following the announcement of the disappointing Q3 2016 backlog, there was a stock price decline. Although Plaintiff believes this price drop is the "best evidence of materiality" [DE 84 at 11-12], I do not think it suggests that the Q3 2015 statement was misleading. The cases cited by Fishman [DE 84 at 16], are distinguishable. In *Silverman v. Motorola, Inc.*, 798 F.Supp.2d 954, 983 (N.D. Ill. 2011), the court found at the summary judgment phase that there was a genuine issue of material fact after a disclosure and subsequent stock price decline as to whether the disclosure revealed new, negative information about the new 3G phones. And in *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012), the defendant was a private college that had "widespread and pervasive" inflation of placement rates of its graduates. After the misrepresentations were discovered, the college made public statements that it had put its legal issues behind it (those statements turned out to be false). *Id.* The court concluded that "[g]iven the nature of [defendants'] tainted past, defendants' statements

10

about the company's current status - that it had eliminated its significant regulatory issues – could have misled a reasonable investor to believe that [it] had remedied the practice that led to those problems  – the company's alleged improper reporting of [job] placement rates."  *Id.* at *7.

In both *Silverman* and *Ross*, which had much stronger inferences of scienter, the additional information disclosed was arguably new information that contradicted the earlier statements, reflecting that the earlier misstatements were indeed material.  In contrast, in this case, the additional details disclosed in Q3 2016 were *not* inconsistent with the prior statements about Q3 2015 backlog, and the stock price decline could have instead been attributable to the disappointing Q3 2016 backlog and Supreme's disclosure of "choppy" and "bearish" economic indicators and a further slowing of the market.  [SAC, ¶ 92; DE 83 at 353.]

The second amended complaint also adds reference to an SEC Regulation, specifically, Regulation S-K Item 101(c)(1)(viii) which requires, where material to understand the issuer's business, disclosure by reporting segment of: "[t]he dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year, together with an indication of the portion thereof not reasonably expected to be filled within the current fiscal year, and seasonal or other material aspects of the backlog."  [SAC, ¶ 43 (quoting 17 C.F.R. 229.101(c)(1)(viii)]. However, this regulation is inapplicable to Supreme's report of its backlog for Q3 2015, because Regulation S-K only applies to "annual or other reports . . . to the extent

provided in the forms and rules under [the Exchange] Act." 17 C.F.R. § 229.10(a)(2); *see*

*In re Seagate Tech. II Sec. Litig.*, No. C-89-2493(a) MHP, 1990 WL 134963, at *9 (N.D. Cal.

June 19, 1990) ("Plaintiffs maintain that the SEC regulations require defendants to also

disclose the specific backlog information . . . However, the regulations that plaintiffs

cite," including "Item 101 of Regulation S-K," "are applicable only to disclosures in

annual reports.").  Fishman seems to concede in his response that the SEC regulation is

not applicable, admitting "[t]here is no dispute that Defendants consistently reported

backlog, quarter over quarter," but stating the second amended complaint "focuses on

Defendants' materially misleading disclosures rather than Defendants' purported

compliance with SEC mandated disclosures."  [DE 84 at 17 n.7.]

In sum, nothing in the second amended complaint has altered my conclusion that

Fishman "fails to allege precisely how the backlog figure was rendered misleading, as

opposed to simply lacking detail."  [Op. at 13.]

2.      **Is There Strong Evidence of Scienter?**

Even if the Plaintiff could somehow show that the Q3 2015 backlog statement

was misleading,  I still don't see any evidence in the second amended complaint

suggesting a strong inference of scienter.  Recall that in a securities fraud case like this, a

Plaintiff must "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), and the

requisite state of mind is "an intent to deceive, demonstrated by knowledge of the

statement's falsity or reckless disregard of a substantial risk that the statement is false."

12

*Higginbotham*, 495 F.3d at 756.

In reviewing the second amended complaint, I've kept in mind that the inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs II*, 551 U.S. at 324. It isn't enough to say that defendants had access to greater detail about the composition of the backlog, or even that they knew the information was important. Rather, as I already held, "Plaintiff must show that the Defendants either intended to deceive or were recklessly indifferent to the fact that their omissions would make their representations misleading – not just that the Defendant knew, or should have known, they were withholding material information." [Op. at 15.]

Although Plaintiff has cited case law in support of the argument that subsequent admissions support an inference of scienter, in this case, there was no post-class period "admission" that the Q3 2015 backlog report was misleading. [DE 84 at 26.] This is in contrast to the cases cited by Plaintiffs like *Roth v. AON Corp.*, No. 04-C-6835, 2008 WL 656069, at *9 (N.D. Ill. Mar. 7, 2008), where the CEO admitted defendants had "violated Aon's Values Statement and its Code of Ethics when Aon entered into" undisclosed contingent commission agreements; or *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009), where the court found, based on the defendants' post-class period deposition testimony and e-mails, that they "privately knew, at the time of the representations, that the [programs] would be disastrous for the company but continued to tout their benefits publicly"; or *Nursing Home Pension Fund, Local 144 v.*

*Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004), where the plaintiffs alleged "specific admissions from the three top executive officers"; or finally *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002), where defendants disclosed post-class period that price protection and take-back guarantees had been offered to customers the previous year (artificially inflating reported revenues and earnings). Here, there were *no* admissions of wrongdoing, and the fact that Supreme disclosed additional, consistent details a year later when comparing the Q3 2016 backlog to the Q3 2015 backlog does nothing to suggest that the earlier statement was fraudulent.

Plaintiff tries to take this argument even one-step further by contending that even assuming Defendants did not believe the composition of the Q3 2015 backlog figure was material at the time, courts have still found that defendants acted with scienter in situations where they were aware of undisclosed information, but professed not to have believed the information was material. [DE 84 at 27.] But again, the cases cited by Plaintiff are distinguishable, because the undisclosed information contradicted defendants' public statements. *See, e.g., In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 811, 819 (N.D. Ill. 2017) (finding strong inference of scienter where officers falsely represented that the company's financial results were "accurate and prepared in accordance with GAAP" where defendants were aware of significant internal control deficiencies which led to net revenue being overstated by 194.7%); *S.E.C. v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) (denying summary judgment where defendants "expressly acknowledge[d] the improper accounting" for

14

one transaction and finding there were "just too many so-called honest mistakes for Defendants to receive the kind of benefit of the doubt that would allow them summary judgment"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *21, *23 (S.D.N.Y. Dec. 2, 2013) (promoting "supposedly stable" agreement with Baker Hughes violated "clear duty to disclose" that Baker Hughes had repudiated the contract).

Here, as I have already said many other times, the omitted information was not inconsistent with later released information, and other than pointing to the alleged omissions themselves, there are no other scienter allegations in the second amended complaint. Indeed, as I have said before, instead of there being a cogent and compelling inference of scienter, the inference is actually to the contrary — i.e. the Defendants believed they had disclosed sufficient, accurate information regarding the Q3 2015 backlog. Moreover, "[i]t's completely plausible to infer that the Defendants, even assuming the omission was material and they knew it, didn't think, nor should they have thought, that omitting the breakdown of the backlog would mislead anyone." [Op. at 15.] Nothing in the second amended complaint has altered this non-culpable inference that I found before.

In sum, the second amended complaint still fails to state with particularity facts giving rise to a strong inference that Defendants made the statements with "the intent to deceive, manipulate or defraud" or with "reckless disregard for the truth." *S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013). This failure to plead a strong inference of

scienter is a basis for dismissal. *See Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933 (7th Cir. 2018) (affirming district court's dismissal of action with prejudice where allegations were insufficient to establish strong inference of scienter).

## Second Quarter 2016 Prediction

The second challenged statement is one that was made by Long, Supreme's Chief Financial Officer, during the unscripted question and answer portion of the earnings call for Q2 2016. [SAC, ¶ 94.] In response to a question about "gross margin[s] in the back half of the year" in light of "the slowing industry," Long predicted that "the backlog is going to settle more towards the way it looked Q3 last year." [*Id.*; Op. at 16; DE 83 at 284-85.] I have already found that this prediction about "what the backlog will be at the end of September, two and a half months later," was "the epitome of a 'forward looking statement . . .'" for application of the PSLRA safe harbor. Nonetheless, Plaintiff's leading argument is that "the Q2 2016 statement was not forward-looking." [Op. at 16-18 (citing 15 U.S.C. § 78u-5(i)(1)(A)); DE 84 at 28.] I'm still not buying it.

Let's start with an overview of the safe harbor under the PSLRA. Under the safe harbor, corporations and individuals may avoid liability even if their public statements prove to be false so long as the statements are forward looking. 15 U.S.C. § 78u-5(c)(1). This is especially so if the forward-looking statements that later prove to be false are "accompanied by meaningful cautionary statements." *Id.* §78u-5(c)(1)(A)(i). But it is important to point out that the safe harbor still applies even in the absence of the cautionary language unless the plaintiff proves that the defendant made the statement

with "actual knowledge" that the prediction was "false or misleading." *Id.* § 78u-5(c)(1)(B)(i).

Defendants have raised the argument that the statement in question — Long's answer to a question in the earnings call — was accompanied by meaningful cautionary language. But I do not need to reach this, because, in any event, Fishman has failed to sufficiently allege that Long had actual knowledge that the prediction was false or misleading. And this is what must be alleged — actual knowledge; recklessness is not enough. *Id.* § 78u-5(c)(1).

Fishman argues that the statement was not forward-looking because it omitted past and present material facts (the divulging of which was necessary to make the statement not misleading). [DE 84 at 19-20.] This reasoning is flawed. For starters, it simply ignores the statutory definition of "forward-looking statement" as including "a statement containing a projection of" any "financial items" and "a statement of future economic performance" 15 U.S.C. § 78u-5(i)(1)(A), (C). It also ignores the plain language of the statute which expressly contemplates application of the safe harbor to claims "based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading." 15 U.S.C. § 78u-5(c)(1). "[T]here is no question under the statute that a material and misleading omission can fall within the forward-looking safe harbor." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) (citing 15 U.S.C. § 78u-5(c)(1)).

While Fishman attacks the prediction for not being reasonable, he does not

directly address my previous finding that other comments made during the question and answer session conveyed caution and uncertainty. This is important because a company's disclosures of red flags "undercut any inference of scienter." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (noting various disclosures of red flags "significantly undermine any hint of fraud.").

As I have previously noted, Supreme warned investors of some potentially choppy times ahead during the earnings call at issue here. For example, Weber specifically stated in the call that Supreme saw "some indications of demand moderation late in the quarter," that it had "lost some business on the fleet side," and "purchases for the rental fleet this year were not as large as they have been historically," and Long stated that "[w]e had lower year-over-year fleet business." [Op. at 13, 22; DE 83 at 280, 296, 289.] Additionally, Defendants notified investors at the outset of the call that any forward-looking statements are within the safe harbor protection of the PSLRA, and that predictions "are subject to risks and uncertainties that could cause actual results to differ materially" and pointed to Supreme's 10-K and other SEC filings for "[i]mportant factors that could cause actual results to differ materially from those in the forward-looking statements." [DE 83 at 278-79.] With all of these warning signals, I stand by my finding that "[t]here were all sorts of things said in the conference call that suggested that caution should be taken" [Op. at 22] and I still believe that the acknowledgment of these potential problems runs contrary to any inference of scienter.

18

Although Fishman argues that the allegedly undisclosed facts left "virtually no chance" that the prediction could be attained, the factual allegations in the second amended complaint just do not support this inference. [DE 84 at 20.] As I recognized before, a prediction is not automatically misleading because there is a fact "cutting the other way." [Op. at 17-18.] Indeed, none of the new allegations affect what I determined before — that this is a case where the most likely inference to be drawn from the facts as detailed in the complaint is a benign one; the Defendants simply made a prediction which just turned out to be wrong. [Op. at 28.] As the Seventh Circuit has recognized:

> There is no securities fraud by hindsight. The law does not require public disclosure of mere *risks* of failure. No prediction – even a prediction that the sun will rise tomorrow – has a 100 percent probability of being correct. The future is shrouded in uncertainty. If a mistaken prediction is deemed a fraud, there will be few predictions, including ones that are well grounded, as no one wants to be held hostage to an unknown future.

*City of Livonia*, 711 F.3d at 758 (internal quotation and citations omitted) (emphasis in original).

Fishman also contends that the Q3 2016 backlog prediction was knowingly false because the Q3 2015 backlog purportedly included undisclosed, atypical fleet orders. [DE 84 at 28.] But just because the Q3 2015 backlog was large and included fleet orders does not suggest that "there was virtually no chance" that future backlogs could be higher. Even if those fleet orders were anomalous, there are no allegations in the second amended complaint suggesting that Long knew, at the time, that similar fleet

orders would not also be placed in Q3 2016. As I already found, "[e]ven if I presume that Weber and Long knew the true makeup of the third quarter 2015 backlog and of the sales shortfalls, that doesn't suggest that Long knew the prediction concerning the third quarter 2016 backlog was false when he made it." [Op. at 19.]

At the time of Long's statement, Fishman claims Supreme was suffering from a significant drop in sales [DE 84 at 21], which was an allegation included in the first amended complaint. [FAC, ¶ 54.] But Fishman now adds allegations from another confidential witness, a former Supreme Outside Sales Manager whose orders were filled by Supreme's facility in Goshen, Indiana, who noted that he "knew the backlog was down because the ongoing problems with delayed and faulty shipments resulted in Supreme losing customers." [SAC, ¶ 61.] Although Fishman alleges the sales decline was "significant," I don't know how the confidential witness would know the numbers of the company, and it is unclear whether the shortfalls occurred before Long made his prediction, and to what degree. [DE 84 at 20-21.] The confidential witnesses' allegations are not inconsistent with Supreme's disclosures in Q2 2016 that it was seeing signs of a slowdown, followed by its disclosures in Q3 2016 that conditions had worsened. Still, nothing in the second amended complaint shows the prediction could not happen, or it was impossible for Supreme to match third quarter 2015 backlog numbers.

In sum, nothing in the second amended complaint shows that the Q3 2016 prediction was false when made, and the allegations do not give rise to a "strong

inference" that Long had "actual knowledge" that the prediction was false or misleading when made.

Once again, Fishman argues that scienter may be inferred from the Defendants' high-ranking positions, confidential witnesses, and insider stock sales. [DE 84 at 29-33.] Fishman continues to assert that Defendants must have had actual knowledge the prediction was false because they "were intimately involved in the operations of the company" and "were aware of the company's successes and failures, including sales shortfalls." [Op. at 19; SAC, ¶¶ 120-25.] But these are nothing more than unsupported conclusions. As I previously found, these allegations "fail[ed] to connect the dots" because knowledge regarding the company's business (including the composition of the Q3 2015 backlog and alleged sales shortfalls) "doesn't suggest that Long knew the prediction concerning the third quarter 2016 backlog was false when he made it." [Op. at 19.] Rather, it is "completely plausible" that Long's prediction of a decline in backlog from the previous quarter, made in the context of disclosures regarding the "slowing industry" and "demand moderation," "accounted for these trends and for the fact that the 2015 third quarter backlog included orders that were perhaps atypical for that quarter." *Id.* at 19-20.

The second amended complaint has added only a single allegation to support the high-ranking position argument, that "Weber often got involved with big customers, and personally attended sales meetings with some of their large customers." [SAC, ¶ 124.] This does not add anything substantial to the previous complaint, which already

alleged that Weber "repeatedly discussed his personal involvement with significant fleet customers, noting that he was 'out in front of' customers." [FAC, ¶ 101.] Thus the second amended complaint suffers from the same deficiency as the previous complaint — there is "no allegation that, even in light of sales shortfalls and the individual Defendants' intimate knowledge about the company's operations, it was impossible for Supreme to match third quarter 2015 backlog numbers" — or that Long had actual knowledge that it would be impossible. [Op. at 20.]

With regard to the allegations from the confidential witnesses, the second amended complaint adds two new witnesses. Although allegations from unnamed confidential sources "require a heavy discount," because they may be "ill-informed," stemming from spite, or misrepresented, *City of Livonia*, 711 F.3d at 759, they can provide an inference of scienter under some circumstances. Factors which can strengthen that inference include a large number of confidential witnesses, descriptions of their jobs which indicate they had first-hand knowledge of the facts, corroboration by other sources, and the inclusion of their real names. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 712 (7th Cir. 2008); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F.Supp.3d 821, 844 (N.D. Ind. 2018). I already analyzed the allegations from CW1, which are the same in the second amended complaint, and I found that it was not enough for her to assert "there were 'signs in July of a sales shortfall,'" for multiple reasons. [Op. at 21-23.] Simply adding two additional unnamed confidential witnesses has not strengthened the pleading of scienter.

Both CW2 and CW3 reported to regional management (several levels below the individual Defendants), and neither is alleged to have knowledge of company-wide numbers. [SAC, ¶¶ 71-78.] Significantly, their allegations are not inconsistent with Long's prediction. For example, CW2 alleges that he missed his personal sales quota in 2016 (selling $5.3 million of a $6 million goal), and that some of his orders were canceled in 2Q and 3Q of 2016. [*Id.* ¶ 71.] But a shortfall of $700,000 is still a very small percentage of Supreme's overall backlog. Moreover, the timing is vague - a shortfall around the time of Long's prediction, when Supreme disclosed signs of slowing down, would not be indicative of anything other than just that, a slowdown. [Op. at 22.]

CW3's allegations are also consistent with company disclosures. She claims her sales goal for 2016 "was later 're-forecasted' because the original goal had been 'too inflated,'" and that she "saw a spreadsheet comparing actual sales to sales goals" in her region, which "confirmed that 'nobody' in [the] region had been making their goals." [SAC, ¶ 76.] But we don't know when her sales were allegedly re-forecasted, by how much, or how much others in her region were allegedly behind in their numbers, or at what point in time.

The testimony of the confidential witnesses does not suggest that there was such a large sales shortfall before Long made his prediction, that it must have been unattainable, or that Long must have known it was unattainable. Maybe even more importantly, these allegations are not inconsistent with the Q2 2016 disclosures cautioning about a slowing industry and signs of softness and demand moderation. [DE

23

83 at 280, 289, 296.] Pointing out consistent versions of the events from other employees does nothing to help Fishman show a strong inference of scienter, or that Long actually knew that his prediction was false at the time he made it.

As in the first round of briefing, Fishman continues to argue that scienter may be inferred due to suspicious stock sales. "[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. A stock sale that is suspicious in scope and timing can support an inference of scienter. *Id.*; *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-cv-01048-TWP-MJD, 2016 WL 4360648, at *18 (S.D. Ind. Jan. 4, 2016). To evidence scienter, stock sales must be "dramatically out of line with prior trading practices." *Makor Issues & Rights, Ltd. v. Tellabs, Inc. ("Tellabs I")*, 437 F.3d 588, 604 (7th Cir. 2006) (quotation omitted). In other words, the trading must be "unusual." *City of Austin Police Ret. Sys. v. ITT Ed. Servs., Inc.*, 388 F. Supp.2d 932, 950-51 (S.D. Ind. 2005). The fact that insiders retained significant holdings weighs against any inference of scienter. *Id.* at 951 (citing *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999)).

In his response, Fishman argues that two types of stock sales support an inference of scienter: (1) the collective sales of the individual defendants and other high-level insiders; and (2) Long's stock sale which he claims is out of line with prior trading practices. [DE 84 at 31-32.] Although both Weber and Long had a stock sale in the class period, I previously found those sales did not support a strong inference of scienter. [Op. at 24-26.] Fishman does not directly address Weber's sale in this round of briefing,

24

but instead concentrates on Long now.

Let's look at the collective sales of the individual Defendants and high-level insiders first.  The first amended complaint alleged that the individual Defendants and other Supreme insiders (who are not named as defendants in this case), realized over $11 million in proceeds from their sales of Supreme stock during the Class Period, and that approximately $9.3 million of that resulted from transactions during the three-month period corresponding to the sales slowdown – the second amended complaint merely ups the numbers – alleging the insiders netted over $12 million during the class period, with approximately $9.5 million of that resulting from transactions during the three-month period from July 22, 2016 through October 21, 2016.  [SAC, ¶ 127.]

In this case, where Long was the individual who made the prediction, it seems that only his knowledge should be relevant in determining scienter and whether the safe harbor provision is applicable.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1082 n. 22 (N.D. Cal. 2001) (in evaluating scienter, the PSLRA requires the Court to consider each defendant's sales separately).  Indeed, other courts have found that the stock sales of insiders not named as defendants are "irrelevant to alleging scienter against the [] named Defendants."  *Plevy v. Haggerty*, 38 F.Supp.2d 816, 834 n. 12 (C.D. Cal. 1998); *see also In re PETsMART Sec. Litig.*, 61 F.Supp.2d 982, 1001 (D. Ariz. 1999) (finding "no reason to consider" the stock sales of individuals not named as defendants absent "specific facts suggesting that defendants intended their manipulation of [company] stock to assist these specific colleagues.").

Plaintiff cites *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996), where the court did consider the stock sale of two insiders (neither of which were defendants), in looking at scienter. [DE 84 at 31.] However, *Shaw* is not only not-binding, but also not compelling. *Shaw* was pre-PSLRA, and the First Circuit only noted plaintiff's allegations of stock sales by two non-defendants after it had already concluded that plaintiffs' other allegations supported a "reasonable inference" of the defendants' scienter. *Id.* at 1224. In specifically addressing the non-defendants' sales, the First Circuit noted that "the level of suspicion warranted by the alleged insider stock sales is marginal." *Id.*

Turning to Long, he had a single sale of 10,00 shares on July 29, 2016 for $166,100. [SAC, ¶¶ 129-32; DE 83 at 501.] In considering Long's sale, while it does raise some suspicion, I cannot say that the timing is sufficient enough to support a *strong inference* that he had actual knowledge the prediction was false when made, or that Long's stock sale was "dramatically out of line with prior trading practices." *Tellabs I*, 437 F.3d at 604. Long only joined Supreme in 2011, so his holdings were relatively small prior to the class period. He owned 15,000 shares through the beginning of 2013, and his holdings increased as he was awarded, and purchased, stock over the years. [DE 83 at 836.] At the start of the class period, Long held 78,799 shares, over 20,000 of which were awarded just a few months earlier in March 2015. [*Id.* at 838.] In light of his relatively small holdings and short time at the company, it is not surprising that the sale in 2016 was Long's first sale of stock.

26

Crunching the numbers, Long sold 10,000 shares for $166,100, which Fishman calculates saved him $53,100 compared to if he had sold on the trading day following the October 20, 2016 announcement of Q3 backlog. [SAC, ¶ 129.] Although Fishman points out that the majority of Long's shares were subject to vesting schedules and over 46% of his retained shares could not have been sold by Long during the class period, I still don't think the sale is entitled to the relevance that Fishman urges. As I noted before, Long "retained large amounts of Supreme shares" (83,667 shares) and "actually ended the Class Period with greater holdings than at the beginning . . . which undermines the inference of scienter." [Op. at 25 (citing *City of Austin*, 388 F. Supp. 2d at 951); DE 83 at 474.] By continuing to hold his shares, Long suffered a loss of over $550,000 when the stock price declined following the October 20, 2016 announcement, which is a much, much bigger loss than Plaintiff alleges Long avoided by his small sale in July. As such, this does not seem like a situation where an insider dumped his stock, suggesting inside knowledge of an impending price drop.

I have spent a considerable amount of time and effort once again determining whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter. *Tellabs II*, 551 U.S. at 322-23. In looking at the context of this statement, I still think it is telling that it was an off-the-cuff statement, made during an unscripted portion of an earnings call in response to an on-the-spot question. Moreover, during the same call that the statement was made, the Defendants disclosed various negative indicators, suggesting to the investors that the outlook was choppy. Finally, the

imprecise words used in the statement - "settle," "more towards" and "the way it looked" are "vague enough that I suspect no reasonable investor hearing those statements would expect Long's prediction to be dead on." [Op. at 27; *see Searls*, 64 F.3d at 1067.] Taking into account all of these facts, and especially taking note of the new allegations in the second amended complaint, I am still led to the conclusion that the inference of scienter is neither compelling nor cogent. Instead, I still believe that the non-culpable inference - "that Defendants withheld information that they had no reason to believe would mislead anyone and that, after accounting for and providing to the public a substantial amount of bad information, they made a prediction which turned out simply to not be quite true – is far more compelling." [Op. at 28.]

In sum, Fishman's claim relating to the second quarter 2016 prediction must be dismissed because it lacks a strong inference of scienter. *See, e.g., Fannon v. Guidant Corp.,* 583 F.3d 995, 1001-02 (7th Cir. 2009) (affirming district court dismissing the case on the pleadings with prejudice where the class complaint failed to raise the strong inference of scienter); *Sandmire v. Alliant Energy Corp.*, 296 F.Supp.2d 950, 960 (W.D. Wis. 2003) (dismissing class action complaint for failure to state a claim for securities fraud where complaint lacked allegations supporting a strong inference of scienter).

### The Section 20(a) Claim

With regard to the Section 20(a) claim, as I noted in my previous order, to state a claim under Section 20(a), plaintiffs must allege a primary securities violation. *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 876 n.1, 881 (7th Cir. 1992). Because I have

found that there is no primary violation, the Section 20(a) claim must also be dismissed.

## Dismissal With or Without Prejudice?

Finally, Plaintiff has already filed two amended complaints, and there is no indication that he could successfully amend the complaint to cure the defects identified above. Considering the procedural posture of this case, especially given the fact that Plaintiff was allowed to replead after having the benefit of my guidance in the first opinion, it is appropriate to dismiss Plaintiff's claims WITH PREJUDICE. *See City of Livonia*, 711 F.3d at 762 (affirming district court's dismissal of the second amended complaint with prejudice for failure to create a strong inference defendants acted with scienter); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322-32 (7th Cir. 1998) (affirming dismissal of second amended complaint and recognizing that the "district judge was not required to give her another chance.").

## Conclusion

For the foregoing reasons, the Court GRANTS the motion to dismiss the second amended complaint [DE 81], and dismisses the claims WITH PREJUDICE.

**SO ORDERED**.

ENTERED: March 29, 2019.

/ s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**